T. N. CARNALL, Appellee, v. FRED J. KRAMER et al., Appellants
(and eight other cases).

**SALES:** Bulk Sales Act—**Good Faith of Purchaser.** A party who, without complying with the Bulk Sales Act (Ch. 64, Acts 37 G. A.), purchases in bulk a stock of goods from a person whose purchase said party knows is a mere subterfuge, will be held to be a receiver of said stock for the benefit of the creditors of the *real* owner and *real transferor.*

**SUBROGATION:** **Purchaser Under Bulk Sales Act.** A purchaser in bulk of a stock of goods who, without fraudulent intent, fails to comply with the Bulk Sales Act, and who, in making the purchase, discharges a valid subsisting mortgage on the goods, will be held subrogated to the rights of said mortgagee when called upon to account to the general creditors of the seller for the value of the goods.

**SALES:** Bulk Sales Act—**Who Deemed Creditor.** A bank which, *during the negotiations for the sale of a stock of goods,* loans money to

pay off a valid subsisting mortgage on the goods, will be entitled to participate as a creditor in the distribution of the proceeds of the stock, in case it is sold in bulk without compliance with the Bulk Sales Act.

*Appeal from Clayton District Court.*—W. J. Springer, Judge.

September 23, 1922.

Action under the Bulk Sales Law, to hold appellants, who purchased a stock of merchandise, as receivers, and to require them to account to the creditors of the seller of the stock for the value thereof. The facts appear in the opinion.—*Affirmed in part; reversed in part.*

*Deacon, Good, Sargent & Spangler,* for appellants.

*W. W. Comstock, E. R. O'Brien, D. D. Murphy & Son, Alex Holmes, William C. Reimer,* and *W. L. Eichendorf,* for appellees.

Faville, J.—One Hurley originally owned a stock of general merchandise at Strawberry Point, Iowa. On October 6, 1919, he sold said stock to the firm of Kramer & Becker for a consideration of $8,000, all of which was represented at the time by a note secured by a chattel mortgage on the stock. Kramer & Becker took immediate possession of the stock, and continued to operate the store thereafter, paying off a portion of the indebtedness due to Hurley. They replenished and added to the stock from time to time. Some time in March, 1920, Becker disposed of his interest in the business to his partner, Kramer, who thereafter continued to conduct the business as previously, under the firm name of Kramer & Becker. Shortly after this change had been made, Kramer met one Countryman at a hotel in Oelwein, and had a conversation with him in regard to the matter of a sale of the stock of goods, Countryman stating that he had a man in view who wanted to buy such a stock. Thereafter, Kramer and Countryman communicated with each other by letter and telephone in regard to the matter, and on April 18, 1920, they met by arrangement at Oelwein. Countryman was accompanied by one Redeman, who was introduced to

Kramer as a prospective purchaser of the stock of goods. Countryman represented to Kramer at that time that Redeman owned certain lands in the states of North Dakota and South Dakota, and that he was in a position to trade for the stock of goods at ·Strawberry Point. On the following day, the three parties went to Strawberry Point, and Redeman looked over the stock of goods. On the 20th of April, 1920, a written contract was signed by Redeman and Kramer. This contract provided for the exchange of certain lands for the stock of goods, at an agreed price of $24,000. It was recited that there was an incumbrance of $4,400 against the land, and that Redeman was to pay Kramer this amount in cash, at the time of the settlement. The contract also expressly provided that Kramer was to furnish a bill of sale of his stock of merchandise, ''showing same clear of all liens and incumbrances, and agrees to protect party of the first part under the Bulk Sales Law.'' The contract likewise provides that the transfer of papers under this contract shall take place within three days after date, but that possession of the properties passed upon the signing of the agreement. It also provides for the payment of $2,500 liquidated damages by either party, in case of default. After this contract had been signed, Redeman took possession of the stock of goods. The fact is that Redeman, the so-called ''purchaser,'' was a mere ''stool pigeon'' for Countryman. Countryman, and not Redeman, owned the property that was to be exchanged for the stock of goods. Redeman never had a dollar of money or property invested in the transaction in any way, and simply consented to play the role which he did at the instance of Countryman, who was the real party in interest, and who paid Redeman $50 for the part which he played.

After the contract had been signed, on April 20th, and before anything had been paid on the purchase price, and while Redeman was in possession of the stock of goods, Countryman got in touch with one Danner, who was engaged in the business of conducting sales and closing out stocks of merchandise. He testified that, at the instance of Countryman, he went to Strawberry Point and examined the Kramer & Becker stock, and made Countryman an offer of $6,000 for it. At just what stage

in the proceedings this took place, is not very clear from the evidence.

The appellants Leibsohn. & Company are engaged in the mercantile business at Cedar Rapids, the firm being composed of Leibsohn and one Valentine. Some time in the fore part. of April, 1920, Countryman had met the members of this firm through one Milton, a real estate man at Cedar Rapids. At that time, he stated to them, in effect, that he was about to close a deal for a stock of goods at Strawberry Point, and that, if he did so, he would like to sell the same to the said firm. This was some time before the negotiations previously referred to with Redeman; and about that time, Valentine went to Strawberry Point with Countryman and examined his stock; but nothing further appears in the record to have been done in the matter until after the contract of April 20th had been entered into between Kramer and Redeman. After this contract had been signed, however, Countryman called Leibsohn by telephone, and Leibsohn and Valentine went to Strawberry Point, where they found Redeman in possession of the stock of goods.

In the meantime, Hurley, having been informed of the contemplated sale by Kramer, notified Countryman and Redeman, on the evening of April 20th, that he held a chattel mortgage upon the stock, which must be satisfied before the stock could be sold.

After Leibsohn and Valentine arrived at Strawberry Point, they made an examination of the stock, and offered Countryman $7,000 for the same. Leibsohn returned to Cedar Rapids the next morning, and Valentine remained to close the deal for the stock. He did not see Countryman that day, but learned from Redeman that Countryman had gone to Oelwein to see Kramer about some trouble that had arisen over the chattel mortgage on the stock. On the morning of April 23d the parties met again. Valentine was told by Countryman that there was an outstanding chattel mortgage of $6,800 on the stock, that would have to be taken care of. He testified that Redeman and Countryman told him that all of the accounts against the stock were paid, and that they proposed that he should advance $4,400 for the purpose of helping to pay off the chattel mortgage. Valentine gave Countryman and Redeman a check for $4,400, made

payable to Redeman, and Redeman drew a check for $4,400, payable to Kramer, at the request of Countryman. This check was drawn on the Cedar Rapids National Bank. Redeman had no funds in the bank at the time; but on the following morning, he went to the bank and deposited the check of $4,400 which Valentine had issued and made payable to him. Kramer took the check for $4,400 which he had received from Redeman, and indorsed the same to Hurley, the holder of the chattel mortgage. This left a balance of $2,400 due on the mortgage.

The deeds to the land mentioned in the contract were turned over to Kramer, manual delivery of the same apparently having been made by Redeman. One parcel of land described in the contract was not deeded; but in lieu thereof, Countryman gave Kramer 100 shares of stock of the Rock Island Railroad Company, which he represented to Kramer to be worth $32.50 on the market. Countryman told Kramer to go to the bank with the deeds and railroad stock, and borrow enough money to pay the balance due on the mortgage to Hurley; and Kramer went to the Strawberry Point State Bank and secured $2,400, on a five-day loan. Kramer proposed to immediately take the railroad stock to Chicago, and turn it into cash, and pay the bank out of the proceeds of this sale. It afterwards transpired that the railroad stock was worthless.

After Kramer had secured the $2,400 from the bank, he paid the same over to Hurley, and received from him a satisfaction of the mortgage; and at said time, which was the afternoon of April 23d, Kramer delivered to Redeman a bill of sale of the stock of goods. Redeman also signed a bill of sale, which appears to be unacknowledged and without date, conveying the stock of goods to the appellants, which bill of sale recites a consideration of $7,000, and also recites that the same is free and clear of any and all incumbrances. Valentine thereupon gave his check to Redeman for the balance of the purchase price, $2,600. This check was indorsed by Redeman to Countryman, who deposited the same to his own credit. After the transactions had been completed in the manner outlined, the appellants took possession of the stock of goods, and proceeded to dispose of the same as their own. Subsequently, this action was started, under the Bulk Sales Statute, to hold the appellants as receivers of

said property, and to require them to account for the value thereof for the benefit of the creditors of Kramer & Becker.

I. It is contended that the Bulk Sales Law has no application to the facts in the instant case; that the appellants are good-faith purchasers from a third party, Redeman, and cannot be held to account to the creditors of the original owners of the stock, Kramer & Becker.

1. SALES: Bulk Sales Act: good faith of purchaser.

Our Bulk Sales Statute is Chapter 64 of the Acts of the Thirty-seventh General Assembly. In a general way, the statute provides that the sale in bulk of a stock of merchandise shall be void as against the creditors of the seller, unless the seller shall, at least seven days before the sale, make a detailed inventory of the same, and unless the purchaser demand and receive from the seller a written list of names and addresses of the creditors of the seller and the amount of indebtedness due to each, and unless the purchaser shall, at least seven days before taking possession of the merchandise, notify every creditor of whom he has knowledge, of the proposed sale,—the price, terms, and conditions thereof. The statute provides that, if any purchaser fails to conform to the provisions of the statute, he shall, upon application of any of the creditors of the seller, become a receiver, and be held accountable to such creditor for the goods so purchased.

Somewhat similar statutes have been enacted in many other states. Williston on Sales, Section 643. By some of these statutes, a sale in bulk of a stock of merchandise without compliance with the provisions of the statute is "presumed to be fraudulent." Our statute, as originally enacted, so provided. Acts of the Thirty-fourth General Assembly, Chapter 150 (Sections 2911-a to 2911-c, inclusive, Code Supplement, 1913). This clause, however, has been eliminated from the statute, and the provision now is that the sale of a stock of merchandise in bulk, without compliance with the statute, "shall be void as against the creditors of the sellers." It also contains the provision for holding the purchaser as a receiver and requiring an accounting.

Appellants' contention at this point is that they purchased the stock in good faith from a third party, Redeman, for full value, and hence are not answerable to the creditors of Kramer & Becker; that, as to them, Redeman was the seller, and not the

firm of Kramer & Becker. We cannot sustain the appellants' contention in this regard, upon the record in this case. The so-called sale of the stock to Redeman was a mere sham and subterfuge. Countryman was negotiating the deal, and used Redeman as a mere go-between. The appellants well knew that the stock of goods belonged to Kramer & Becker. They were on the ground, and were familiar with the fact that the deal between Kramer and Countryman was hanging fire over the adjustment of the chattel mortgage. They claimed to have made inquiry in regard to creditors who might have claims against the stock. They had actual notice that they were purchasing the stock of Kramer & Becker through the medium of the transaction with Countryman and Redeman. They were clearly chargeable with facts and circumstances sufficient to bring to them knowledge that they were buying the stock of Kramer & Becker, and to require them to comply with the provisions of the Bulk Sales Act in ascertaining and notifying the creditors of Kramer & Becker.

We do not pass upon the question of the rights of one who is a good-faith purchaser for valuable consideration, without notice or knowledge sufficient to put him upon inquiry, from a third person who has likewise bought in good faith from the original owner of the stock. We hold, however, that the facts and circumstances surrounding the transaction in the instant case are such as to charge the appellants as purchasers under the Bulk Sales Law, and to render such sale void under its provisions, and to make the appellants liable to account for the said stock to the creditors of the original owners, Kramer & Becker. The facts in the instant case distinguish it from the rule announced in *Prokopovitz v. Kurowski,* 170 Wis. 190 (174 N. W. 448); *Markarian v. Whitmarsh,* 78 N. H. 1 (95 Atl. 788); *Huston v. Alexander Drug Co.,* 58 Okla. 236 (158 Pac. 892).

II. The court fixed the value of the stock of goods at $10,500, and charged appellants, as receivers, to account in that amount. The evidence on the question of value differs greatly. The amount fixed by the court appears to be the cost price, as determined by an inventory. It is contended that this is not the market value, and that the stock had depreciated below cost price. There is evidence in the record in regard to the value

of the property, which covers a wide range. In a matter of this kind, the actual value cannot be easily determined, and it is, at best, somewhat an approximation.

After a careful examination of the evidence on this question, we are disposed to acquiesce in the conclusion of the trial court on the question of value.

III. The appellants paid to Countryman the sum of $4,400 in cash, for the definite and specific purpose of paying off the outstanding chattel mortgage upon the stock of goods. It is the contention of the appellants that they are entitled to be subrogated to the rights of the mortgagee as the creditor of Kramer & Becker, to the amount so advanced for said purpose. Under the statute, the appellants are not charged in this action with actual fraud, or with any intent to defeat, hinder, or delay the creditors of Kramer & Becker. The sale to them is voidable solely because of the terms and provisions of the Bulk Sales Law. This law was enacted for the evident purpose of preventing merchants who may be heavily indebted from making secret sales of their entire stock for the purpose of defrauding their creditors. It also may have had for its object to provide a way by which purchasers of such stocks might be protected from vexatious litigation by the creditors of the seller, and also to enable the creditors of the seller to protect their claims.

2. SUBROGATION: purchaser under Bulk Sales Act.

Our statute makes a purchase under the Bulk Sales Law without compliance with its terms voidable, as against creditors of the seller. It does not declare the same to be fraudulent. Such a sale under our law is voidable, regardless of whether there is any taint of fraud in connection with the transaction. The creditors of the seller are entitled, under this statute, to an accounting by the purchaser for the stock of goods sold, whether or not the purchase was in good faith. Where a sale of a stock of merchandise has been made without compliance with the Bulk Sales Statute, the purchaser becomes, under the statute, a receiver of the property, and must account therefor. One evident and obvious purpose of the statute is to restore the *status quo,* where a sale of this kind has been made, so that the property may be subjected to the claims of the creditors of the seller, the same as though the sale had not been made. That be-

ing so, the creditors of the seller are certainly not entitled, under the statute, to any more than they would have been entitled to, had the voidable sale not been made. In the instant case, the creditor Hurley had a valid, subsisting, outstanding lien, under his chattel mortgage, upon the stock of goods. This lien was superior to the claims of any of the other creditors of Kramer & Becker. Under the Bulk Sales Statute, the sale to the appellants is voidable at the instance of the creditors of Kramer & Becker. Such creditors have a right to set aside the sale, because the Bulk Sales Statute was not complied with; to hold the purchasers as receivers; and to require an accounting of the property. This is all they are entitled to. Neither by the statute nor on general principles of equity are these creditors entitled to profit by reason of the making of this voidable sale. They are entitled to be restored to the situation in which they would have been, had the sale not been made. We think the case presents a situation for the application of the equitable doctrine of subrogation. The appellants are not shown to have acted fraudulently. They paid $4,400 in cash, for the express and definite purpose of paying off to that extent the chattel mortgage that then existed upon the stock of goods, which was a lien superior to the claims of any other creditors of Kramer & Becker. In good conscience and equity, they are entitled to be subrogated to the rights of the holder of said chattel mortgage to the extent of the amount so advanced by them, to wit, $4,400. We think the purpose of the doctrine of subrogation is applicable in such a situation as is disclosed in the instant case. The doctrine of subrogation is a well recognized one of equity, and has as its basis the doing of complete and essential justice between the parties, without regard to form. Subrogation is a creature of the equity courts, applied to prevent the doing of an injury in a particular case, and under a particular state of facts. *Kent v. Bailey,* 181 Iowa 489; *Arlington St. Bank v. Paulsen,* 57 Neb. 717 (78 N. W. 303); *Stevens v. King,* 84 Me. 291 (24 Atl. 850); *Hudson v. Dismukes,* 77 Va. 242; *Morehouse v. Brooklyn Heights R. Co.,* 185 N. Y. 520 (78 N. E. 179).

Subrogation may be granted *pro tanto,* under some circumstances. *Black v. Chicago G. W. R. Co.,* 187 Iowa 904.

In *Hicks v. Beals*, 83 Ore. 82 (163 Pac. 83), the Supreme
Court of Oregon considered a case arising under the Bulk Sales
Act of that state. Said act (Lord's Oregon Laws, Sections
6069, 6070) provides that a sale of a stock of goods in bulk
without compliance with said statute shall be "conclusively pre-
sumed fraudulent and void." Hicks purchased a garage of the
defendant, Beals, with the equipment and stock of merchandise
in bulk. There was an outstanding mortgage on the property.
As a part of the transaction, Hicks paid off this mortgage with
a portion of the purchase price. The mortgage was released,
and Hicks went into possession of the property. He did not
comply with the Bulk Sales Statute. The court found that
Hicks paid the mortgage, not as a volunteer or intermeddler,
but to perfect the title to the property which he was about to
obtain; and that the mere constructive fraud of a purchaser
under the Bulk Sales Statute would not prevent him from be-
ing subrogated to the rights of the mortgagee whom he paid.
See, also, *Adams v. Young*, 200 Mass. 588 (86 N. E. 942); *Loos
v. Wilkinson*, 113 N. Y. 485 (21 N. E. 392).

In the instant case, there is no proof of any actual fraud
on the part of the appellants. The sale to them is rendered void
solely by reason of the terms and provisions of the Bulk Sales
Statute. The doctrine of subrogation is applicable to the par-
ticular facts in this case. Appellants are to be held to account
for the stock of goods which they purchased without compli-
ance with said statute. They are entitled to be subrogated to
the rights of the creditor who held the chattel mortgage on said
stock of goods, to the amount of the $4,400 paid by them to
satisfy and remove said lien. This in no manner jeopardizes
the interests of the creditors of Kramer & Becker. To this ex-
tent, it restores the *status quo*. It is equitable and just that
this should be done, under the facts of this case. The decree
of the lower court should have so provided.

IV. The Strawberry Point State Bank alleged that the
sale to appellants was fraudulent, and asked to be subrogated to
the rights of the holder of the chattel mortgage to the extent of

3. SALES: Bulk
Sales Act: who
deemed creditor.

$2,400, being the amount loaned by the bank to
Kramer for the purpose of paying off said chat-
tel mortgage. The lower court denied this

claim by the bank, and it has not appealed. The court allowed the bank to participate in the assets, as one of the creditors of Kramer.

It is contended that the bank was not entitled to so participate. The claim is that the sale of the stock of goods had been fully consummated before the bank became the creditor of Kramer, and that the Bulk Sales Law is only for the benefit of creditors of the seller who exist at the time the sale is made.

Conceding the soundness of the rule contended for, that creditors of a seller who became such after the sale has been fully consummated, cannot avail themselves of the provisions of the Bulk Sales Act, we do not think that such rule applies to the situation of the Strawberry Point State Bank in the instant case. The bank became a creditor before the sale was fully consummated. It loaned its money to Kramer as a part of the very transaction involved in the closing up of the deal, and before the sale had been fully closed. We think it was the creditor of the seller, and entitled to participate as such in the proceeds of the stock.

The decree of the trial court should be modified to the extent herein pointed out, and should provide that appellants should be subrogated to the rights of the chattel mortgagee to the extent of $4,400. In all other respects, the decree will be affirmed. A decree may be entered in the district court in accordance with this opinion, or in this court, as the parties may elect. It is so ordered.—*Affirmed in part; reversed in part.*

STEVENS, C. J., EVANS and ARTHUR, JJ., concur.