PRATT PAPER COMPANY, Appellee, E. L. McCONKIE, Intervener,
Appellant, v. CARL P. EIFFLER et al., Appellees.

**BANKRUPTCY:** Actions by Trustee—Invalid Bulk Sale. A trustee
in bankruptcy may maintain an action to compel a party to account
for the value of a stock of goods purchased from the bankrupt with-
out complying with the Bulk Sales Act.

**SALES:** Bulk Sales Act—Voidability of Sale. The purchase of a stock
of goods in bulk without compliance with the Bulk Sales Act is
voidable at the instance of the creditors of the seller or their
representative, irrespective of the good faith of the buyer.

**SALES:** Bulk Sales Act—Accounting—Credits Due the Purchaser. A
good-faith purchaser for full value of a stock of goods and fixtures
in bulk, without complying with the Bulk Sales Act, will, when
called upon to account for the value of the property, be credited
with such *fractional part* of the purchase price directly applied to
the payment of an unsecured creditor of the seller's as such payment
bears to the entire debts of the seller.

**SALES:** Bulk Sales Act—Accounting—Unpaid Promissory Notes. A
purchaser of a stock of goods in bulk without complying with the
Bulk Sales Act is, when called upon to account for the property,
under obligation to account for the amount of unpaid promissory
notes executed by him in payment of the goods.

*Appeal from Story District Court.*—R. M. WRIGHT, Judge.

JUNE 22, 1923.

ACTION by the trustee in bankruptcy, to have a sale by the
bankrupt of an entire stock of goods and fixtures adjudged void,
under the Bulk Sales Act. The trial court granted the inter-
vener relief to the extent of $300, and denied all other relief
prayed for. The intervener appeals.—*Modified and affirmed.*

*Fred E. Hansen,* for appellant.

*Neiman & Winans* and *Charles H. Hall,* for appellees.

FAVILLE, J.—Graves & Company were a copartnership, do-
ing business as jewelers in the city of Nevada. On April 1,

1921, said firm entered into a certain contract with the appellee Eiffler, by which contract Eiffler purchased the entire stock of merchandise and fixtures belonging to Graves & Company. By the terms of the contract, $500 was paid in cash by the purchaser at said time, and it was provided that an inventory should be taken of the stock, and possession given the 1st day of May following. The inventory was accordingly taken, and aggregated $4,800. On May 2d, Graves & Company executed a bill of sale to Eiffler for said stock and fixtures. Eiffler took possession of the property at said time, and paid to Graves & Company $1,500 in cash, and executed and delivered to said company notes for $2,800, being the balance of the purchase price, $1,500 of said amount being due March 1, 1922, and $1,300 due March 1, 1923. The $1,300 notes were nonnegotiable instruments. On said May 2, 1921, a supplemental contract was entered into between said parties, which provided for the delivery of possession of the stock to the purchaser upon the payment of $1,500 in cash and the execution of notes to the amount of $2,800, which were to be secured by chattel mortgage upon said stock. This supplemental contract provided that the notes due March 1, 1923, should be drawn as nonnegotiable notes, and that within 60 days the purchaser should take up said notes, and issue negotiable notes in place thereof, in the event that he had not been held liable in the meantime for any indebtedness which Graves & Company might be owing to its creditors; and said contract recited that this arrangement was made for the purpose of securing the purchaser against all liability growing out of the failure of Graves & Company in paying its creditors for which the purchaser could be liable under the Bulk Sales Law. The supplemental contract also provided that it was agreed between the seller and the purchaser that the notice to creditors provided for under the statute was waived under this agreement. The $2,000 which was paid by the purchaser to the seller was all paid out by the latter to its outstanding creditors, with the exception of $300. It was agreed between the parties that, at the time Eiffler purchased the stock and made settlement for the same and took possession thereof, he had no knowledge of the existence of the creditors of Graves & Company, and that he acted in good faith, and with no intent to defraud, and was as-

sured by Graves & Company that they would pay their creditors in full out of the purchase price of this stock. He, however, obtained no list of creditors, as required by the Bulk Sales Law. Within a week after the date of settlement, May 2, 1921, the purchaser learned of the existence of creditors of Graves & Company, whereupon he immediately communicated with the National Jewelers' Board of Trade, for the purpose of ascertaining the extent of the creditors and the amounts, if any, owed by Graves & Company. Through this source he learned of a number of creditors of Graves & Company, and on May 7, 1921, five days after he had completed the purchase and taken possession of the stock, he addressed a letter, by registered mail, to each of the creditors of whom he had gained knowledge. This letter advised the several creditors to whom it was addressed that he had purchased the stock of jewelry and fixtures of Graves & Company, and had taken possession thereof, and that, under the terms of his settlement, Graves & Company were not fully released for a period of sixty days from and after May 2d, and advised the creditors that, if they had any claims against Graves & Company, and expected to hold the stock and fixtures liable, they were required to make such claims within sixty days. None of said creditors took any action in said matter, except the plaintiff herein, who, on June 21, 1921, instituted this action to set aside said transfer under the Bulk Sales Law. On June 28th, Graves & Company filed a petition in bankruptcy, and were adjudged bankrupt, and the appellant, McConkie, was duly appointed trustee of said bankrupt estate. He intervened in said action, and by said intervention seeks to have said sale adjudged to be null and void, and prays an accounting by the purchaser for the value of said stock, and that he be held as a receiver therefor, under the provisions of the Bulk Sales Law. It is agreed that the fair and reasonable market value of the stock of merchandise and fixtures, on May 1, 1921, was the purchase price of $4,800. It also appears that Graves & Company scheduled claims in the bankruptcy proceedings to the extent of $12,000, and that the trustee in bankruptcy had, outside of the stock of goods in controversy, assets of said bankrupt estate of the value of approximately $1,200. It also appears that the notes for $2,800 given by the purchaser were delivered by Graves

& Company to the First National Bank of Nevada, which was a creditor of said company prior to the commencement of this action. These notes were subsequently listed by Graves & Company in the bankruptcy proceedings, as part of their assets. The trial court found that the entire proceeds of the sale had been delivered to the creditors of Graves & Company, except the sum of $300, for which amount he entered judgment in favor of the trustee in bankruptcy, and against the purchaser. The plaintiff's petition was dismissed, and the court established the title of the purchaser in the stock of goods and fixtures, subject to a lien in favor of the trustee in bankruptcy thereon for the said sum of $300.

I. The first question we consider is whether or not the trustee in bankruptcy can maintain this action. Under the terms and provisions of the Bulk Sales Law of this state (Chap-

1. BANKRUPTCY: actions by trustee: invalid bulk sale.

ter 64, Acts of the Thirty-seventh General Assembly), the purchaser of a stock of merchandise and fixtures who fails to comply with the requirements of the act "shall, upon application of any of the creditors of the seller, transferor, or assignor, become a receiver and be held accountable to such creditors" for the goods that have so come into his possession.

Under the Bankruptcy Act (U. S. Comp. Stat., Section 9654, Paragraph 70), the title to all property of the bankrupt not exempt, passes to the trustee in bankruptcy for the benefit of the creditors of the bankrupt.

The trustee in bankruptcy, for some purposes, represents the creditors of the bankrupt. One of his duties is to take over the property of the bankrupt and administer it for the benefit of the creditors of the bankrupt. If the creditors of the bankrupt could maintain an action to set aside the transfer in question, because of failure to comply with the Bulk Sales Law, the right so to do vested in the trustee in bankruptcy. *In re Clayton,* 259 Fed. 911, 913; *Niklaus v. Lessenhop,* 99 Neb. 803 (157 N. W. 1019).

II. Was the sale in question voidable under the provisions of the Bulk Sales Act?

This act provides that a sale without compliance with its requirements is "void," as against the creditors of the seller.

Of necessity, this means that the sale is "voidable" at the instance of the creditors of the seller, or of one (as a trustee in bankruptcy) who can act in their place and stead. · The action is not based upon fraud in the transfer of the stock. In *Carnall v. Kramer*, 194 Iowa 359, we said:

2. SALES: Bulk Sales Act: voidability of sale.

"Our statute makes a purchase under the Bulk Sales Law without compliance with its terms voidable, as against creditors of the seller. It does not declare the same to be fraudulent. Such a sale under our law is voidable, regardless of whether there is any taint of fraud in connection with the transaction. The creditors of the seller are entitled, under this statute, to an accounting by the purchaser for the stock of goods sold, whether or not the purchase was in good faith. Where a sale of a stock of merchandise has been made without compliance with the Bulk Sales Statute, the purchaser becomes, under the statute, a receiver of the property, and must account therefor."

In this case we think it must be held that the sale was without substantial compliance with the provisions of the Bulk Sales Act. The purchaser did not demand and receive from the seller a written list of names and addresses of the creditors of the seller, with amount of the indebtedness due or owed to each, and certified by the seller under oath to be a full, accurate, and complete list of his creditors and of his indebtedness. The statute requires this. Nothing of the kind was done. It is contended that the seller orally assured the purchaser that he had but few creditors, and that the seller would pay them out of the money received from the sale of the stock. But the purchaser had no right, under the statute, to accept such representations and promises in lieu of the matters provided for in the statute. There was no attempt to comply with the provisions of the law in this respect. If the purchaser was willing to assume the chances of there being unpaid creditors of the seller, without exacting the statement required by the statute, he must bear the consequences. To hold otherwise would render the statute nugatory. Other provisions of the act were not complied with. As bearing on the question, see *Carnall v. Kramer*, supra; *Interstate Rubber Co. v. Kaufman*, 98 Neb. 562 (153 N. W. 585); *Coffey v. McGahey*, 181 Mich. 225 (148 N. W. 356); *Marquette*

*County Sav. Bank v. Koivisto,* 162 Mich. 554 (127 N. W. 680).

III. The chief question involved in this appeal is with regard to the extent of the purchaser's liability under the statute. The statute provides that, in the event that the purchaser fails to conform to the provisions of the act, he shall, upon proper application, become a receiver, and be held accountable for all the merchandise and fixtures that have come into his possession by virtue of the sale.

3. SALES: Bulk Sales Act: accounting: credits due ·the purchaser.

It is conceded that the value of the merchandise and fixtures in this case was the purchase price of $4,800. Of this amount $1,700 had been paid by the purchaser to the seller, and by. the latter paid to bona-fide existing creditors of the seller. The trial court held that there could not be recovery of this amount, because it had been paid to the creditors of the seller.

It is true that the purchaser did not make the payment directly to the creditors of the seller, but there is evidence in the record justifying the conclusion that, at the time of this payment, it was the understanding and agreement between the seller and the purchaser that the money so paid should be used for the payment of the creditors of the seller. The doctrine of subrogation is invoked in behalf of the purchaser. In *Carnall v. Kramer,* supra, we said:

"One evident and obvious purpose of the statute is to restore the *status quo,* where a sale of this kind has been made, so that the property may be subjected to the claims of the creditors of the seller, the same as though the sale had not been made. That being so, the creditors of the seller are certainly not entitled, under the statute, to any more than they would have been entitled to, had the voidable sale not been made."

In that case, a portion of the purchase price had been used under agreement between the seller and purchaser to pay off an outstanding chattel mortgage on the stock of goods. We held that the purchaser under such circumstances was entitled to be subrogated to the rights of the creditor who had a lien on the stock.

In this case, the payments in question were made to unsecured creditors of the seller. Does this make any difference?

One obvious purpose of this statute is to effectuate an equitable division of the assets of the seller among his creditors.

The question at this point is whether or not the purchaser is entitled to credit for the amount that had been paid to the unsecured creditors of the seller out of the purchase price of the stock. If he is entitled to such credit, it is solely on the theory that he is entitled to be subrogated to the rights of such creditors of the seller. The doctrine of subrogation can give the purchaser no greater rights than the creditors, to whom this money was paid, would have, as against the stock or the proceeds thereof. They had no lien upon the stock, but, under the provisions of this act, they did have a right to participate, as creditors, in the amount to be paid by the purchaser as the value of the stock, because of his failure to comply with the Bulk Sales Law. We think that the purchaser whose money had been directly used to pay these unsecured creditors of the seller's is entitled, equitably, to be subrogated to the rights which said creditors would have, to share *pro rata* with the other creditors in the proceeds of the stock for which the purchaser must account. Seventeen hundred dollars of the purchase price of this stock have been paid to the creditors of the seller. The purchaser is entitled, in equity, to be subrogated to the rights which these creditors would have had, had such payment not been made. He should be permitted to stand in their shoes as a creditor to the amount of $1,700, and entitled to participate *pro rata* with other creditors in the total value of the stock, which was $4,800, for which he must account.

In *Fecheimer-Keifer Co. v. Burton,* 128 Tenn. 682 (164 S. W. 1179), an action arose under the Bulk Sales Act of that state. It was conceded that the purchasers had paid the full value of the stock of goods, without intent to defraud. The proceeds of the sale were turned over to the bona-fide creditors of the seller. The court said:

"It seems clear, since the sale was only fraudulent in law (*Daly v. Drug Co.,* 127 Tenn. 412, 424, 155 S. W. 167), that the purchasers are entitled to stand in the place of the creditors whose demands against their vendor were thus paid by the purchase-money notes, or the proceeds thereof. Those whose purchase of property has been under such a statute denounced

as constructively fraudulent, and avoided by creditors of the seller, may stand in the place of other creditors whose demands have been thus paid.''

The court reviewed the cases on the subject of subrogation, and concluded:

''The right of the defendant purchasers, in this case in equity, therefore, was to be subrogated to the rights of the creditors, paid by the proceeds of sale, to a pro-rata share of the value of the stock of goods.''

In *Adams v. Young*, 200 Mass. 588 (86 N. E. 942), action was brought by a trustee in bankruptcy against the purchasers of a stock of merchandise, who had acquired the same from the bankrupt while he was insolvent, without complying with the Bulk Sales Law of that state. It appeared that, in making the sale, both the seller and the purchaser acted in good faith, and with no actual intent to defraud the creditors. The Massachusetts statute makes noncompliance therewith conclusive of fraud as to the creditors of the seller. The court said:

''But one whose purchase of property has for that reason been avoided by the creditors of the seller, being himself free from any actual fraud, may stand in the place of creditors whose demands he has paid out of the property or in consideration of the transfer to himself. * * * So, if he has paid off debts which constituted liens or incumbrances upon the property conveyed to him, he may, for his protection and reimbursement, take by subrogation the rights of the secured creditors whom he has thus paid.''

The decree of the trial court was correct in requiring the purchaser to account for the $300 of the purchase price which had been paid to the seller, and no part of which had been paid by the latter to the seller's creditors.

The trial court was in error, however, in holding that the purchaser should not account for any portion of the $1,700 which had been paid to the creditors of the seller. The purchaser is entitled to credit for the pro-rata share of the said $1,700 that said sum bears to the total amount due creditors of the seller. He must account to the intervener for the balance of said sum of $1,700.

With respect to the promissory notes given by the pur-

chaser to the amount of $2,800, representing a portion of the
purchase price, it appears that all of said notes have been as-
signed to the First National Bank of Nevada,
and that $1,500 of said notes are negotiable and
that $1,300 of said notes are nonnegotiable.
None of said notes have been paid by the pur-
chaser of the stock. The First National Bank of Nevada was
the creditor of the seller to the extent of the face value of these
notes, at the time the purchase of said stock of goods was made.
The record discloses that these notes have been listed by the
bankrupt as part of the assets of his estate.

4. SALES: Bulk
Sales Act: ac-
counting: un-
paid promissory
notes.

The trial court found that the trustee of the bankrupt
could pursue said notes in the hands of the First National Bank.
But such right, if one exists, is not determinative of the ques-
tion involved in this case. The purchaser must account in this
action to the intervener for the value of the stock which he
purchased. He has not paid the notes which have passed into
the hands of the First National Bank. The bank is not a party
to this suit. Not having paid said notes, the purchaser is not
at this time entitled to stand in the shoes of said creditor, or to
be subrogated to any extent to the rights which said creditor
may have had against the seller. Had said notes been paid to
the bona-fide creditor of the seller, then the purchaser would
be entitled to be subrogated to the rights of such creditor. But
such a situation does not now exist, and the purchaser must
account for the value of the purchased stock.

The decree should have provided that the appellee Eiffler
should pay to the appellant the sum of $300, with interest
thereon from the 2d day of May, 1921, at 6 per cent. It should
further have provided that the purchaser was entitled to be
subrogated to the rights of the creditors who had been paid
$1,700 out of the proceeds of the purchase price of said stock
of goods, and to have credit for the pro-rata amount that the
said $1,700 bore to the total amount due the creditors of said
seller at the date of said sale.

After said amount is so ascertained and the purchaser is
allowed credit therefor, he should be required to account to the
appellant for the balance of the said sum of $1,700, with interest
on said sum since May 2, 1921.

The decree should have further provided that the said purchaser, Eiffler, should pay to the said intervener the further sum of $2,800, with interest thereon at 6 per cent per annum since the said 2d day of May, 1921.

The cause will be remanded to the district court for a decree in accordance with this opinion, and with direction, if the parties cannot agree thereon, to take testimony for the purpose of ascertaining the total amount due the creditors of the seller, Graves & Company, at the time of the sale of said stock, and for the purpose of fixing the pro-rata credit to be allowed and the exact liability of the purchaser, Eiffler, in accordance with this opinion.

The question is not raised in this case as to the right of the intervener to invoke the provision of the Bulk Sales Law against the purchaser, notwithstanding the pendency of the proceedings in bankruptcy. We refrain from discussion of that question or from expression of any opinion thereon, as it is assumed by all parties that he can maintain the action, as trustee in bankruptcy of the seller.

The costs of this appeal will be taxed to the appellee Eiffler.
—*Modified and affirmed.*

PRESTON, C. J., EVANS and ARTHUR, JJ., concur.