ROBERT L. LEACH, State Superintendent of Banking, et al., Appellees, v. COMMERCIAL SAVINGS BANK OF DES MOINES, Appellee.

STATE OF IOWA et al., Appellees, v. CONTINENTAL CASUALTY COMPANY OF HAMMOND, INDIANA, et al., Appellants.

1156

APRIL 7, 1927.

REHEARING DENIED APRIL 6, 1928.

*Sargent, Gamble & Read,* for Continental Casualty Company of Hammond, Indiana, appellant.

*Carr, Cox, Evans & Riley,* for American Surety Company of New York, appellant.

*Stipp, Perry, Bannister & Starzinger,* for Fidelity & Deposit Company of Maryland, appellant.

*Bradshaw, Schenk & Fowler,* for Royal Indemnity Company of New York, appellant.

*Parrish, Cohen, Guthrie, Watters & Halloran,* for Federal Surety Company of Davenport and Detroit Fidelity & Surety Company of Detroit, Michigan, appellants.

*Miller, Kelly, Shuttleworth & McManus,* for Maryland Casualty Company of Baltimore, Maryland, appellant.

*Clark, Byers & Brunk,* for John A. Elliott, C. F. Frazier, Johnson Brigham, E. G. Linn, Mildred Hager Elliott, Rey Hager Martin, Ellen M. Hager, Harry A. Elliott, Philanda Hall, and Julia Closson, appellants.

*Sullivan, Rippey & Sullivan,* for Ed. J. Raymond, appellant.

*Ben J. Gibson,* Attorney-general, and *Maxwell A. O'Brien,* Assistant Attorney-general, for Robert L. Leach and L. A. Andrew, appellees.

*Ben J. Gibson,* Attorney-general, and *George Cosson,* for state of Iowa and R. E. Johnson, Treasurer of State, appellees.

FAVILLE, J.—The Commercial Savings Bank was a corporation duly organized under the laws of the state of Iowa, and engaged in the general banking business in the city of Des  Moines, Iowa. On January 21, 1923, W. J. Burbank assumed the office of state treasurer, and shortly thereafter, with the advice and approval of the executive council, designated the said Commercial Savings Bank as a depository for state funds. Said bank gave security for said deposit. Code of 1897, Section 112, is as follows:

"The bank or banks designated as such depositary shall be required to give security to the state, to be approved by the executive council, for the prompt collection of all drafts, checks, certificates of deposit or coupons that may be delivered to such depositary by the treasurer of state for collection; and also for the safe-keeping and prompt payment, on the treasurer's order, of the proceeds of all such collections; also, for the payment of all drafts that may be issued to said treasurer by such depositary."

In pursuance of the designation of the said Commercial Savings Bank as a depository of state funds, and in accordance with said statute, certain bonds were furnished by the said Commercial Savings Bank to the state treasurer. These bonds were executed in part by personal sureties and in part by surety companies. The bond of the personal sureties was in the penal sum of $500,000, and the several bonds of the surety companies aggregated the total amount of $275,000. The bond of the personal sureties in the amount of $500,000 and that of the American Surety Company in the sum of $45,000 and the bond of the Detroit Fidelity & Surety Company in the sum of $25,000 were executed and approved on or about January 19,

1923. The remaining bonds in controversy were all executed by the several surety companies and approved on or about September 2, 1923. The bank was closed on December 31, 1924, and on February 3, 1925, Robert L. Leach, the state superintendent of banking, was duly appointed receiver of said bank. Leach was subsequently succeeded as superintendent of banking and as receiver of said bank by L. A. Andrew. At the time that the bank closed, the state had on deposit in said bank the net amount of $253,680.15. On February 14, 1925, the state treasurer filed with the receiver a claim for the full amount of the fund on deposit in said bank on the date that it closed, and prayed in his petition that said claim be established as a preferred claim upon the assets in the hands of said receiver. The various surety companies filed petitions of intervention in said proceedings, and asked that the state's said claim be allowed and paid as a preferred claim. Subsequently, the state treasurer brought an action against all of the sureties on the various depository bonds, praying recovery in behalf of the state for the full amount of the deposit of the state in said bank at the date it closed. Various cross-petitions, answers, and replies were filed in this action. The pleadings are very voluminous. By agreement of parties, the two causes, with all of the issues tendered therein, were consolidated and tried as one action. Upon the trial, the court allowed the claim of the state treasurer against the receiver in the full amount, as the claim of a general depositor, and denied to the state any preference, and decreed that the said claim be paid ratably with the claims of other general depositors in said bank. The state has not appealed from this portion of the decree. The court entered judgment in favor of the state and against each of the surety companies for the full amount of the penalty provided in the several bonds, and entered judgment against the personal sureties on the $500,000 bond who appeared in said action, in the total amount found to be due to the state, to wit, the sum of $253,680.15. The decree provided that, as between the several judgment debtors:

"As between the sureties upon the bonds, their liability shall be such proportion of the amount of money required by them to be paid the state of Iowa to satisfy its claim as the penalty in each of their bonds bears to the sum of $775,000,

provided that, as between the bond signed by corporate sureties and the bond signed by personal sureties, the latter shall be treated as a unit, and in the event any of said sureties pay or are required to pay the state of Iowa more than their pro-rata share on such basis, then they shall be entitled to contribution from other sureties, so as to equal their payments on such basis.''

The decree also provided:

''Upon the payment and satisfaction in full of all claim of the state of Iowa by said judgment debtors, said judgment debtors shall be entitled to and shall be subrogated to all of the rights of the state of Iowa in the claim of the state of Iowa and R. E. Johnson, treasurer of state of the state of Iowa, against the receiver, as hereinbefore established. No judgment debtor shall be subrogated, however, to an amount in excess of the amount actually paid by such judgment debtor, and all of the judgment debtors shall only be subrogated as to the amount actually paid by such judgment debtors.''

As to F. C. Waterbury, personal surety on said bond, the cause was continued, and subsequently tried as a separate action, and a supplemental decree was entered, fixing the amount of the liability of the said Waterbury the same as that of other personal sureties. Said Waterbury has prosecuted his separate appeal to this court, which will be considered and disposed of in a separate opinion.

The appeal of the Federal Surety Company has been dismissed.

It will be noticed that the bond of the Detroit Fidelity & Surety Company, the one bond of the American Surety Company to the extent of $45,000, and the bond of the personal sureties to the amount of $500,000, were all executed prior to May 3, 1923. All of the remaining bonds were executed subsequent to that date. Code Supplement, 1913, Section 3825-a, was in effect prior to May 3, 1923. Said section is, in part, as follows:

''When the property of any person, partnership, company or corporation has been placed in the hands of a receiver for distribution, after the payment of all costs the following claims shall be entitled to priority of payment in the order named:

"First. Taxes or other debts entitled to preference under the laws of the United States.

"Second. Debts due or taxes assessed and levied for the benefit of the state, county or other municipal corporation in this state."

On May 3, 1923, Chapter 189 of the Acts of the Fortieth General Assembly became effective. Under said act, the preference formerly allowed the state as to funds in a depository bank when such bank was placed in the hands of a receiver was withdrawn. *Leach v. Exchange State Bank of Stuart*, 200 Iowa 185.

We consider this appeal on the assumption, without deciding, that, prior to May 3, 1923, Code Supplement, 1913, Section 3825-a, was applicable to receiverships of insolvent banks, and that, under said statute, in the event that an insolvent bank was placed in the hands of a receiver, the state was entitled to claim a preference in the debt due it from said bank.

I. The appellees contend that the appellants are in no event entitled to be subrogated to any rights which the state, as the obligee in the several bonds, had against the principal in said bonds, the bank. The trial court allowed the appellants to be subrogated to the rights of the state as a general depositor in the bank. It awarded subrogation to this extent, and from this order the state has not appealed. In this state of the record, we refrain from any pronouncement on the question as to whether the sureties can be subrogated to the rights of the state, as we do not deem that question involved in this appeal, under the circumstances. We assume the right to subrogation, and consider the question as to the proper extent of such subrogation.

II. Appellant's main contention is that they are entitled to be subrogated to the preferential right that the state had under Code Supplement, 1913, Section 3825-a, although such preference existed only in the event that a receiver was appointed, and even though no such preferential right was available to the state when a receiver was appointed.

Subrogation is "the act of putting one person in the place of another, or the substitution of another person in the place of the creditor, to whose rights he succeeds in relation to the debt." *Heuser v. Sharman*, 89 Iowa 355.

It is a well settled rule that, before subrogation can be enforced, the debt must be paid by the party seeking subrogation. 37 Cyc. 374. See, also, Section 11667, Code of 1924.

In the case of a surety, the essential prerequisite to subrogation is the payment of the obligation by the surety. When he has done this, a court of equity may, and generally should, grant subrogation, by letting the surety step into the shoes of the creditor, as to any lien or equity the creditor may have against the obligor. The right to subrogation is not a contractual right. It is one established and recognized by equity as within its plenary power to effectuate justice. The very basis and foundation of the right rests upon performance of the obligation on the part of the surety. There can be no subrogation until the surety has performed. Then, and not until then, does any right to subrogation come into being. Then, and not till then, has the surety put himself in a position to ask or claim any right of subrogation at the hands of a chancellor. When the surety has performed, when he has paid his principal's obligation, when he becomes entitled to subrogation, then the question necessarily follows: To *what* right, lien, or thing does he become subrogated? Can it be anything else than to such liens, equities, or other rights of whatever kind or character as are *then* in the hands of the creditor for the payment, security, or protection of the debt? No decree of subrogation *could* be entered until *after* payment by the security. Subrogation can only date from that time, not from some previous time. The rights or equities which the creditor has for the protection of the debt, and to which the surety can be subrogated upon payment of the debt, can be none other than those *then* existent. The court cannot, at that time revive a lost security not then belonging to the creditor, and transfer it by the process of subrogation to a surety.

A homely illustration may elucidate the proposition. A becomes surety on the bond of B to C. In addition to the bond, C holds a note and mortgage belonging to B, as additional security for the same debt. Before the debt becomes due, C surrenders the note and mortgage to B. Subsequently, A pays the debt in full to C. He then seeks to be subrogated to C's rights under the mortgage. He could not be subrogated until he paid the debt. When he did so, C had nothing to which he

could be subrogated. A court of equity could not breathe life into the defunct mortgage and, by subrogation, give it validity in the hands of A. In short, at the time that subrogation became effective, there was nothing upon which it could operate. It must be obvious that a performing surety can only be subrogated to such rights, liens, or other securities as are *in esse.* He cannot be subrogated to a thing that does not exist.

Applying these general rules to the facts of the instant case, we have a situation where it may be conceded that, under the provisions of Code Supplement, 1913, Section 3825-a, at the time the bonds in question were executed, the state had the right of a preferred depositor, in the event that said bank was placed in the hands of a receiver. The legislature took away from the state the right of a preferred depositor in the event that a receiver was appointed, by the enactment of Chapter 189, Acts of the Fortieth General Assembly. The bonds still remained as security for the deposit. The only relief the sureties seek is that they may be subrogated to the right of the state against the bank. What were the rights of the state against the bank at the time that appellants became entitled to subrogation? At that time, the state had *only* the right to participate with other depositors in the bank as a general depositor, without preference. The appellants were entitled to be subrogated, if at all, to *this* right, and by the decree of the trial court they have been so subrogated, and of this order no complaint is made by the state. They took, under the order of subrogation, all that the court *could* give them at the time: to wit, the entire right which the state *then* possessed against the bank. Equity by subrogation could do no more. They executed the bonds, knowing that the preferential right of the state under Code Supplement, 1913, Section 3825-a, could be withdrawn by the sovereign at any time the legislature saw fit to deny to the state such remedy for the collection of its debt. In no event could the preference come into being until a receiver was appointed. When that time came, the remedy of a preferential right was no longer available to the state, and hence appellants could not be subrogated to such extinct right.

III. Appellants, however, invoke the rule that the statute, Code Supplement, 1913, Section 3825-a, inhered in and became a part of their contract, and hence contend that the enactment of

Chapter 189, Acts of the Fortieth General Assembly, impaired the obligation of their contract.

It may be conceded at this point that all existing statutes, so far as applicable, inhered in the contract. Such is the gen-erally recognized rule. The right of the surety to be subrogated to the rights of the creditor against his principal does not, however, depend upon contract. It is solely founded upon principles of justice and equity. There was no contractual right to subrogation that could be impaired. . .

It is important that the appellants' situation be not overlooked. They are sureties on a bond. Their undertaking and obligation are set forth in the bond. There was nothing whatever by virtue of the existence of Code Supplement, 1913, Section 3825-a, that changed the status and relation of the appellants from that of sureties on a bond. Their undertaking is to pay the *full* amount of money deposited in the bank, and that payment is to be made, not in the event of the appointment of a receiver, but in *any* event. Such was their obligation. The sureties had no contractual right to subrogation, even in the event that they paid the amount of the bonds. No right of subrogation was given them by the statute. It was solely a right which a court of equity might recognize at the time and under the conditions when subrogation was sought.

In *McCormick v. Rusch*, 15 Iowa 127, we said:

"The language under consideration is, 'No state shall pass any law *impairing* the *obligation* of contracts.' The pivotal words, as applied to the present case, are, '*impairing*' and '*obligation*,' the latter being the most important. On discussing this question, we find the following, among other definitions: Justice Washington, in *Ogden v. Saunders*, 12 Wheat. 318: 'The *obligation* of a contract is the law which binds the parties to perform their agreement.' Justice Thompson: 'It is the law which creates the obligation, and whenever, therefore, the *lex loci* provides for the dissolution of the contract in any prescribed mode, the parties are presumed to have acted subject to such contingency.' Justice Trimble: 'It may be fairly concluded that the *obligation* of the contract consists in the power and efficacy of the *law* which applies to and enforces performance of a contract, or the payment of an equivalent for its nonper-

formance. The *obligation* does not inhere and subsist in the contract itself, *proprio vigore*, but in the law applicable to the contract. This is the sense, I think, in which the Constitution uses the term *obligation.*' Chief Justice Marshall: '*Obligation* and remedy, then, are not identical; they originate at and are derived from different sources. It would seem to follow that the law might act upon the remedy without acting on the obligation.' ''

In *Holland v. Dickerson,* 41 Iowa 367, we said:

''Obligation is correlative with right. Obligation rests upon one party; right belongs to the other. Perhaps as good a definition of obligation as can be given is that contained in the recent case of *Lessley v. Phipps,* in the Supreme Court of Mississippi, reported in 13 American Law Register 236 [49 Miss. 790], as follows.: 'The obligation of a contract is the duty of performance according to its terms, the means of enforcement being a part of the obligation, which the states cannot by legislation impair.' It has also been said that the obligation of a contract is its binding power, that which compels its performance, or, as defined by the Supreme Court of the United States (2 Wheat. 197), the law of the contract. See *Blair v. Williams,* [4 Litt. (Ky.) 35], and *Lapsley v. Brashears,* 4 Littell 66. This obligation, this duty of performance, this binding power which compels performance, this law of the contract, the Constitution declares shall not be impaired. But all change is not impairment. Impair means to make worse, to diminish in quantity, value, excellence or strength, to lessen in power, to weaken, to enfeeble, to deteriorate. See Webster's Dictionary. The Constitution, then, simply inhibits the passage of any law which shall weaken the power which compels the performance of a contract.''

We think the conclusion is inevitable that the enactment of Chapter 189 in no way can be construed to have impaired the obligation of the contract of the appellants.

IV. But appellants contend that, at the time of the execution of the bonds, they became *eo instanti* vested with the right to be subrogated to the then existing preferential right

 which the state had under Code Supplement, 1913, Section 3825-a, in the event that a receiver was subsequently appointed, and that they could

not be deprived of such vested right by subsequent legislation without doing violence to well established constitutional provisions. The "vested right" claimed by appellants was not one conferred upon them directly or even indirectly, except as the appellants might, by performance of their contract, be entitled to be subrogated in equity to the right of the state to a preference in the event that a receiver was appointed for the bank.

Very many cases might be cited on the question of "vested right," covering a very wide field of judicial pronouncement. It is a generally accepted rule that a right is not "vested" unless it is something more than a mere expectation, based on an anticipated continuance of present laws. It must be some right or interest in property that has become fixed or established, and is not open to doubt or controversy. *Van Horn v. City of Des Moines,* 195 Iowa 840, 846. The rule as to vested right is stated in Sutherland on Statutory Construction, Section 164, as follows:

"A law can be repealed by the lawgiver; but the rights which have been acquired under it while it was in force do not thereby cease. It would be an act of absolute injustice to abolish with a law all the effects which it had produced. This is a principle of general jurisprudence; but a right, to be within its protection, must be a vested right. It must be something more than a mere expectation, based upon an anticipated continuance of the existing law. It must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or a legal exemption from a demand made by another. If, before rights become vested in particular individuals, the convenience of the state induces amendment or repeal of the laws, these individuals have no cause to complain."

The same author also says (Section 163):

"Rights depending on a statute, and still inchoate, not perfected by final judgment, or reduced to possession, are lost by repeal or expiration of the statute."

Cooley's Constitutional Limitations (7th Ed.) 511, states the rule as follows:

"First, it would seem that a right cannot be considered a vested right, unless it is something more than such a mere ex-

pectation as may be based upon an anticipated continuance of the present general laws: it must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or a legal exemption from a demand made by another."

In *Pearsall v. Great Northern R. Co.*, 161 U. S. 646 (40 L. Ed. 838), the Supreme Court of the United States says:

"A vested right is defined by Fearne, in his work upon Contingent Remainders, as 'an immediate fixed right of present or future enjoyment;' and by Chancellor Kent as 'an immediate right of present enjoyment, or a present fixed right of future enjoyment.' 4 Kent Com. 202. It is said by Mr. Justice Cooley that 'rights are vested, in contradistinction to being expectant or contingent. They are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. They are expectant when they depend upon the continued existence of the present condition of things until the happening of some future event. They are contingent when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting.' Principles of Const. Law, 332."

In *Campbell v. Holt*, 115 U. S. 620 (29 L. Ed. 483), the court considered a case involving a repeal of a statute of limitations. The court said:

"It is much insisted that this right to defense is a vested right, and a right of property which is protected by the provisions of the Fourteenth Amendment. It is to be observed that the word vested right is nowhere used in the Constitution, neither in the original instrument nor in any of the amendments to it. We understand very well what is meant by a vested right to real estate, to personal property, or to incorporeal hereditaments. But when we get beyond this, although vested rights may exist, they are better described by some more exact term, as the phrase itself is not one found in the language of the Constitution. We certainly do not understand that a right to defeat a just debt by the statute of limitations is a vested right, so as to be beyond legislative power in a proper case. The statutes of limitation, as often asserted, and especially by this court, are founded in public needs and public

policy—are arbitrary enactments by the law-making power."

In *Morley v. Lake Shore & M. S. R. Co.*, 146 U. S. 162 (36 L. Ed. 925), it appeared that a judgment bore a certain rate of interest, under existing statutes. The legislature changed the rate of interest on judgments, and made it apply to judgments rendered before the act was passed. The court held that the act was constitutional. The court said:

"His right was to collect such damages as the state, in its discretion, provided should be paid by defendants who should fail to promptly pay judgments which should be entered against them, and such right has not been destroyed or interfered with by legislation. The discretion exercised by the legislature in prescribing what, if any, damages shall be paid by way of compensation for delay in the payment of judgments is based on reasons of public policy, and is altogether outside the sphere of private contracts."

So in the case at bar, the discretion rested in the legislature to determine, as a matter of public policy, whether or not the state should have a preference in funds of an insolvent bank in the hands of a receiver. There was no private contract involved in said matter. And when the legislature saw fit, in its wisdom, to change that public policy and withdraw its preference in such funds, no vested rights were invaded or affected.

It has been generally held that the repeal of usury laws does not deprive parties of vested rights or impair the obligations of contracts. *Ewell v. Daggs*, 108 U. S. 143 (27 L. Ed. 682); *Curtis v. Leavitt*, 15 N. Y. 9; *Parmelee v. Lawrence*, 48 Ill. 331; *Woodruff v. Scruggs*, 27 Ark. 26; *Mechanic's & W. M. Mut. Sav. Bank v. Allen*, 28 Conn. 97.

In *Baker's Executors v. Kilgore*, 145 U. S. 487 (36 L. Ed. 786), the court considered a law of Tennessee providing that rents and profits of the property of a married woman should not be subject to the debts of her husband, and held that a creditor who held a judgment against the husband before the passage of the act was not thereby deprived of a vested right. In *Terry v. Anderson*, 95 U. S. 628 (24 L. Ed. 365), the court considered a statute of limitations affecting the liability of stockholders in a bank. The court said:

"The liability to be enforced in this case is that of a stockholder, under an act of incorporation, for the ultimate redemp-

tion of the bills of a bank swept away by the disasters of a civil war which had involved nearly all of the people of the state in heavy pecuniary misfortunes. Already the holders of such bills had had nearly four years within which to enforce their rights. Ever since the close of the war, the bills had ceased to pass from hand to hand as money, and had become subjects of bargain and sale as merchandise. Both the original bill holders and the stockholders had suffered from the same cause. The business interests of the entire people of the state had been overwhelmed by a calamity common to all. Society demanded that extraordinary efforts be made to get rid of old embarrassments, and permit a reorganization upon the basis of a new order of things. This clearly presented a case for legislative interference, within the just influence of constitutional limitations."

The act was held to be within constitutional limitations.

In the instant case, the legislature may well have deemed it of great public importance that the rights of the state, as a depositor in an insolvent bank under receivership, should not be preferred to those of the public who were depositors in such a bank.

In *State ex rel. Folsom v. Mayor & Admr. of New Orleans,* 109 U. S. 285 (27 L. Ed. 936), judgments were recovered against the defendant city for damages caused by a mob, under a statute permitting such recovery. At the time of the injuries, and when one of the judgments was recovered, the city was authorized to levy and collect a tax of 175 cents upon every one hundred dollars of assessed value of property. Subsequently, by the adoption of a new Constitution, the power of the city to impose taxes was limited to ten mills on the dollar of the valuation. The action was in mandamus, to enforce payment of the judgments. The plaintiffs contended that:

"* * * the subsequent limitation imposed upon its power violated that clause of the Federal Constitution which prohibits a state from passing a law impairing the obligation of contracts, and also that clause of the Fourteenth Amendment which forbids a state to deprive any person of life, liberty, or property without due process of law."

The court said:

"* * * the relators have no such vested right in the taxing

power of the city as to render its diminution by the state, to a degree affecting the present collection of their judgments, a deprivation of their property, in the sense of the constitutional prohibition.''

... See, also, *Freeborn v. Smith*, 2 Wall. (U. S.) 160 (17 L. Ed. 922) ; *Garrison v. City of New York*, 21 Wall. (U. S.) 196 (22 L. Ed. 612) ; *Randall v. Kreiger*, 23 Wall. (U. S.) 137 (23 L. Ed. 124) ; *Wilson v. Simon*, 91 Md. 1 (45 Atl. 1022) ; *Green v. Abraham*, 43 Ark. 420; *Foster v. Essex Bank*, 16 Mass. 244.; *Satterlee v. Matthewson*, 16 S. & R. Pa. 169, affirmed by United States Supreme Court, 2 Pet. (U. S.) 380 (7 L. Ed. 458) ; *Town of Danville v. Pace*, 25 Gratt. (Va.) 1.

At the time of the execution of the bonds in question, the most that can be claimed by the appellant in the nature of a vested right was that, in the event that their principal, the bank, should not pay to the obligee, the state, the funds that were deposited, and in the further contingency and event that a receiver should be appointed, and in the further contingency that appellants should perform their obligation and pay off the bonds, and in the further event that a court of equity decreed subrogation to them, they might, under such subrogation, claim any preferential rights the state might have as against the bank.

At this point it is well to remember that the bonds of the appellants and the obligation incurred by them thereunder had no relation whatever to the appointment of a receiver for the bank. Their obligations were complete, regardless of whether the bank was ever placed in the hands of a receiver or not. The bonds were not given in contemplation of any receivership for the bank; they were given solely to indemnify the state for the funds deposited in the bank. It is altogether possible that the appellants could have been called upon to perform the obligations on their bonds without there having been any receivership whatever in connection with the bank. In other words, the question of whether a receiver might be appointed and the state might file a claim and demand a preference in the assets of the bank was in no way connected with or a part of the appellants' undertaking to pay the deposit. The situation comes squarely within the language of some of the cases cited, that the alleged right of the appellants was not a vested right, because it was

nothing more than a mere expectation, based upon an anticipated continuation of the then existing law that, in the event that the bank should fail, and a receiver should be appointed therefor, a right of preference would exist as to the state, to which the appellants might, in the happening of such a contingency, become subrogated, upon performance by them. This was not such a "right of interest in property that had become fixed and established" at the time of the adoption of Chapter 189 as to make it a vested right, within the recognized meaning of that term, and one which could not be disturbed by the enactment of said law. Chapter 189 was enacted before the bank was declared to be insolvent, before any receiver was appointed, before any right to any preference had arisen. We are constrained to hold, and do hold, at this point that, at the time of the execution of the bonds in question, the appellants did not have such a vested right in the preferential right of the state to claim the money deposited by it in the hands of the bank in the event that a receiver was appointed, that the legislature could not thereafter repeal said statute and deprive the state of such preferential rights. See *Kuhl v. Farmers Bank,* 203 Iowa 71.

Appellants place great reliance upon the case of *United States Fid. & Guar. Co. v. Rathbun,* 160 Minn. 176 (199 N. W. 561). In that case it appeared that a bank was designated as a depository for state funds, and executed a bond, with sureties, securing said deposit. In the written application for the bond, the bank represented to the surety company that a deposit by the state created a preferred lien against its assets, which was true. At that time, it was the established and well recognized law of the state of Minnesota that a surety had a right to be subrogated to the rights of his principal, upon the payment of the secured obligation. After the said bond had been executed, the legislature passed a statute as follows:

"In proceedings to wind up an insolvent bank in which state funds were deposited, the state shall continue to be a preferred creditor, and in cases where a bond with sureties has been given by the depository as security for such deposit, then the state may proceed either as a preferred creditor against the assets of the insolvent depository or as the obligee on such bond against the surety or sureties thereon or against both

according as the state board of deposits may deem advisable, but in case the state receives or recovers any amount of its claim from such surety or sureties, the latter shall not, by reason thereof, be subrogated to the claim of the state against the assets of the insolvent depository as a preferred creditor.'' Chapter 518, Section 1, Laws of Minnesota, 1921.

The court held that the right of subrogation attached when the bond was given, and that it was not within the power of the legislature to destroy that right. It is to be noticed that the statute in the Minnesota case is altogether different from the statute in the case at bar. The statute in Minnesota merely undertook to take away the right of *subrogation* which a surety had, upon payment of the obligation of his principal, but still left the preferential right in the state. There is no such situation in the case at bar. The surety has not been denied by Chapter 189 the right to be subrogated to all the rights which the principal had when the receiver was appointed. The thing that was taken away was the right of the *principal* (the state) to a preference. Such reliance is placed upon the Minnesota decision that we deem it not inappropriate to review briefly some of the cases cited in the opinion in that case.

*Nally v. Long,* 56 Md. 567, involved the right of a surety as against the principal debtor, and the court said:

''Although the rights of the latter (surety) are not consummated until he has paid the debt, they sprang into existence at the time when the debt was contracted, and his claims against the principal debtor relate back to that time.''

It is apparent that the case has no bearing upon the facts in the instant case. The claims of appellants against the principal debtor are in no way involved here.

The case of *McArthur v. Martin,* 23 Minn. 74, also involved only the liability of the principal to the surety. The court said:

''So soon as the surety pays the debt of his principal, there arises in his favor an equity to have the securities held by the creditor for his debt turned over to him, and to avail himself of them as fully as the creditor could have done. * * * Payment by a surety, although it extinguishes the remedy and discharges the security as respects the creditor, does not have that effect as between the surety and his principal. As between the latter,

it is in the nature of a purchase by the surety from the creditor. It operates in equity as an assignment of the debt and securities. The right of subrogation and the equitable assignment relate to the date of the suretyship, *as against the principal* and those claiming under him.''

This, likewise, was a case between the surety and his principal.

The Supreme Court of Minnesota in the *Rathbun* case quotes from *Knighton v. Curry,* 62 Ala. 404, as sustaining the conclusion of the Minnesota court. In the *Knighton* case, the statutes of Alabama declared that the bond of a tax collector ''operates from its execution as a lien in favor of the state or county on the property of such tax collector for the amount of any judgment which may be rendered against him in his official capacity for state or county taxes * * *.'' The sureties on the tax collector's bond paid judgments obtained against him, and sought to be subrogated to the lien which the state held against the property of the tax collector. It appeared that in Alabama there was in existence a statute which compels a creditor to assign to a surety paying the debt any judgment the creditor may have obtained upon it, and authorizes the surety to assert ''in law or equity, any right or lien against the principal debtor which the plaintiff could assert if the debt had not been paid.'' The court merely held that the surety, having paid the judgment under the bond, was entitled to be subrogated to the then existing lien in favor of the state against the property of their principal, the tax collector. No such question as is involved in the instant case was presented in the *Knighton* case, the court expressly declaring:

''A surety is not entitled to subrogation until payment of the debt for which he is liable.''

The case of *Furnold v. Bank of State of Missouri,* 44 Mo. 336, holds no more than that:

''As soon as the surety has paid the debt, an equity arises in his favor to have all the securities, original and collateral, which the creditor held against the person or property of the principal debtor, transferred to him, and to avail himself of them as fully as the creditor could have done, for the purpose of obtaining indemnity from the principal.''

The case of *Craythorne v. Swinburne,* 14 Ves. Jr. Ch. 160,

involved only the question of contribution between cosureties.

In the *Rathbun* case, the Supreme Court of Minnesota says:

"Lord Eldon, in *Craythorne v. Swinburne,* 14 Ves. Jr. Ch. 160, approves of the basis for asserting the right of subrogation thus: 'That, after that principle of equity has been universally acknowledged, then persons acting under circumstances to which it applies may properly be said to act under the head of contract, implied from the universality of that principle.' "

It is interesting to note just what Lord Eldon said in said case, and we quote from the opinion as follows:

"It was contended for the first time in *Deering v. The Earl of Winchelsea* (1) that there is no difference whether the parties are bound in the same or by different instruments, provided they are cosureties in this sense for the debt of the principal; and farther, that there is no difference if they are bound in different sums; except that contribution could not be required beyond the sums for which they had become bound. I argued that case, and was much dissatisfied with the whole proceeding, and with the judgment; but I have been since convinced that the decision was upon right principles. Lord Chief Justice Eyre in that case decided that this obligation of cosureties is not founded in contract, but stands upon a principle of equity; and Sir Samuel Romilly has very ably put what is consistent with every idea, that, after that principle of equity has been universally acknowledged, then persons acting under circumstances to which it applies may properly be said to act under the head of contract, implied from the universality of that principle."

The pronouncement of Lord Eldon had no reference whatever to subrogation, but merely to the right of contribution between cosureties.

With profound respect for the decisions of the high court of our sister state, we are not disposed to follow its pronouncements in the cited case, in so far as they are inconsistent with the conclusions herein announced.

V. As previously stated, certain of the bonds involved in this appeal were executed subsequently to May 3, 1923. Said  bonds were executed at a time when no preferential right existed in behalf of the state in the funds deposited in the bank which was sub-

sequently placed in the hands of a receiver. As previously stated, there is great confusion and much discussion in the cases in regard to whether the common-law prerogative right in the sovereign exists in the various states of the Union, some recognizing such a right, and others denying it. If there was such a common-law prerogative right, the enactment of Chapter 189 removed the said prerogative right as to banks. This was clearly the effect of our holding in the *Leach* case, supra. Certainly, the legislature had the power to provide that the common-law prerogative right to preference, if the same existed, should not be exercised by the sovereign in particular instances, as, for example, in the case of banks placed in the hands of receivers. Such was the effect of the enactment of Chapter 189, and therefore, whether a common-law prerogative right to a preference existed in such cases prior to the enactment of Chapter 189, it was withdrawn and withheld from the state after the enactment of such chapter, and it therefore follows that the bonds of certain of the appellants which were executed subsequently to May 3, 1923, were not, in any event, entitled to be subrogated to any claimed prerogative right of the state's to a preference.

VI. A special appeal is prosecuted by the Maryland Casualty Company, which company executed one of the surety bonds in controversy. The appeal of said appellant presents a single question. The trial court found that the amount due from the depository bank to the state of Iowa was $253,680.15. The court also found that the total amount of bonds given to the state of Iowa by said bank as security for the deposit of funds in said bank aggregated $775,000.

The condition of the bond of the Maryland Casualty Company recited that the principal in said bond has been designated as a depository of state funds; and recited the condition thereof as follows:

"Now, therefore, the condition of this obligation is such, that if the principal shall, during the term commencing at nine o'clock A. M. on the 1st day of September, 1923, and ending with the close of banking hours on the first day of September, 1924, faithfully account for and pay over legal demand [made during the term aforesaid] all moneys deposited with said principal by or on behalf of the said obligee, then this obligation

shall be null and void, otherwise to remain in full force and virtue in law."

The second provision in said bond is as follows:

"That the surety shall only be liable hereunder for such proportion of the total loss sustained by the obligee as the penalty of this bond shall bear to the total amount of bonds or other security furnished by the principal to the obligee."

Code of 1897, Section 112, is quoted supra.

The contention of the appellant Maryland Casualty Company is that its maximum liability on its said bond of $25,000 is that it should pay 25/775 of the loss sustained by the state of Iowa, and that it is not liable in contribution to other surety companies to any greater amount. The court held that the appellant Maryland Casualty Company was liable for its full pro-rata share of the total loss on the basis of the penal amount of said bond, and that the cosureties were entitled to contribution accordingly.

The bond in question was a statutory bond, expressly given under the requirements of Code of 1897, Section 112. The requirement is for security to be given to the state, to be approved by the executive council, and, among other things, provides for the safe-keeping "and prompt payment on the treasurer's order of the proceeds of all of such collections." The bond was given for the sole purpose of complying with the statutory requirement. The surety thereof was bound in the full penal sum of $25,000, upon the statutory condition of safe-keeping and prompt payment of the funds so deposited with the obligor. The second provision of the bond above quoted, that the surety thereunder should be liable only for such portion of the total loss sustained by the obligee as the penalty of the bond should bear to the total amount of bonds of other sureties furnished by the principal to the obligee, was inconsistent, not only with the former recitals of the bond, but with the express provisions of the statute. It is argued by the appellant Maryland Casualty Company that the bond was approved as written, by the executive council, and therefore must be construed and enforced according to its written terms. But the executive council were not clothed with any authority to waive or set aside the express provisions of the statute, and their approval of a bond with conditions that were in conflict with the provisions of the statute would

not release the surety from the liability which the statute imposes. The provisions in addition to those required by the statute must be rejected as surplusage. We have recently had occasion to discuss a somewhat similar provision in the case of *Philip Carey Co. v. Maryland Cas. Co.*, 201 Iowa 1063, where we reviewed the authorities at length; and repetition of the discussion therein contained is now unnecessary. We hold at this point that the bond was a statutory bond, and that the appellant Maryland Casualty Company was liable thereunder for the full amount of the penalty named in said bond, and that the limitations contained in the second paragraph of said bond were surplusage and nugatory.

VII. It is contended that Chapter 189 of the Acts of the Fortieth General Assembly is unconstitutional and void and repugnant to the Constitution of the state of Iowa, and particularly violates Section 29 of Article III of the Constitution. Said section of the Constitution is as follows:

"Every act shall express but one subject, and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title."

The title of Chapter 189 of the Acts of the Fortieth General Assembly is as follows:

"An act to amend Section eighteen hundred seventy-seven (1877) of the Code (C. C. Sec. 5803), relating to receiverships for banks."

It is contended that there is nothing in the title of Chapter 189 to indicate that the act is to affect the preference provided for under Code Supplement, 1913, Section 3825-a. Section 1877, Code of 1897, which was amended by Chapter 189 of the Acts of the Fortieth General Assembly, was a part of the general chapter on banking, and provided for the examination of banks by the auditor of state and for the closing of a bank and for the appointment of a receiver for such bank and the winding up of its affairs. Said Chapter 189 amended said section, and provided more specifically for the administration of the banking law through the superintendent of banking. We

construed this act in *Leach v. Exchange State Bank of Stuart,* supra. We therein said:

"We think that, to say the least, these changes in the statute, and the enlargement of the powers and duties of the superintendent of banking, and the corresponding exclusion of the necessity for a receiver and judicial direction in the distribution of an insolvent state bank's assets, would fully warrant, if not in fact require, if recognized rules of statutory construction will permit, a holding, in accord with the doctrine announced in *Cook County Nat. Bank v. United States,* supra [107 U. S. 445 (27 L. Ed. 537)], that the general statute providing for a preference on behalf of the state and its municipalities, in the distribution of the assets of a corporation in the hands of a receiver, is no longer applicable to banks."

We also said:

"We therefore hold that Chapter 189 of the Acts of the Fortieth General Assembly, in connection with the statute thereby amended and prior statutes on the subject, constituted a separate and complete code of laws governing the organization, operation, and liquidation of state banks, and controlled the distribution of their assets, notwithstanding the general provisions of Section 3825-a."

There was no amendment of Section 3825-a, and no attempt to amend the same in terms, by the enactment of Chapter 189. Code Supplement, 1913, Section 3825-a, is in the general statute applying to *all* cases where receivers are appointed. In the *Marathon* case, supra, we held that a receiver of a bank came under these general provisions in regard to receiverships of *any* person, company, or corporation within the state. The legislature, by the enactment of Chapter 189, made no attempt to change the terms and provisions of this statute, but did expressly provide for a change in the manner of the administration of banks through receiverships. The title was germane to the subject-matter of the act, and we think that the act contained but one subject, and that the same was clearly expressed within the title. We have uniformly held that titles of legislative acts are to be liberally construed, and that the court does not declare a legislative enactment to be unconstitutional unless it clearly and undoubtedly violates the provision of the Constitution. As bearing somewhat on the question discussed, see

*Beresheim v. Arnd,* 117 Iowa 83; *State v. Fairmont Creamery Co.,* 153 Iowa 702; *Wise v. Palmer,* 165 Iowa 731; *State v. Hutchinson Ice Cream Co.,* 168 Iowa 1; *State v. Gibson,* 189 Iowa 1212.

VIII. One other question may properly be considered in this opinion. It is contended in argument by certain of the sureties on the personal bond (to wit, Elliott *et al.*) that the en- actment of Chapter 189 constituted a release on the part of the state of the preference to which the state was entitled under Code Supplement, 1913, Section 3825-a, and that, because of the release of said rights by the enactment of such statute, the said sureties were discharged. It is the familiar rule of ordinary suretyship that, when the creditor has in his hands securities for satisfying the debt, and relinquishes the same without the consent of the surety, the surety will be discharged. *City of Maquoketa v. Willey,* 35 Iowa 323; *Port v. Robbins,* 35 Iowa 208; *Hendryx v. Evans,* 120 Iowa 310; *Read v. American Sur. Co.,* 117 Iowa 10; *Central State Bank v. Ford,* 194 Iowa 904. This general rule, however, we think does not apply under the circumstances of the instant case. In the first place, the state did not have any "additional security," within the proper meaning of that term, as applied to the law of suretyship. The preferential right which the state had under Code Supplement, 1913, Section 3825-a, was a right which could come into effect *only* in the event that a receiver was appointed for the bank. It was not in any proper sense "additional security," for the repayment to the state of the funds deposited in the depository bank. The obligation of the sureties on their bond which ran to the state was an unqualified obligation to repay the amount so deposited. There was no contingency or condition therein relative to the appointment of a receiver, or any preferential right. No such situation existed by virtue of the preferential right created by the statute as could bring into play the doctrine of contribution between cosureties. The state could not pursue its preferential right, save upon the one condition that the bank was closed and the receiver appointed. We do not think that the statutory preferential right which existed under Code Supplement, 1913, Section 3825-a, was such "additional security" as that the subsequent repeal of said section

operated as a discharge of the personal sureties on the bond in question. No one had any power or authority to discharge such preferential right or release the same except the legislative branch of the state, by the enactment of a statute. No individual could have prevented the "release" of the statutory preferential right. The authorities who selected the depository bank and approved the bond had nothing to do with the preferential right. They could not "release" it. Who could impart notice to the sureties that the legislature was to enact a statute waiving the preferential right of the state? Appellants dealt with the sovereign, which, under our form of government, functions through the three separate and distinct departments, —the legislative, executive, and judicial. The preferential right which existed in behalf of the state, under the statute, in the event that a receiver was appointed, was solely created by the statute, and appellants were bound to know that such conditional preferential right so existing could be modified by subsequent act of the legislature. Such legislation did not change the contract in any manner.

It is the general rule, also, that a surety is not discharged by any act on the part of the creditor or obligee, such as relinquishment of security held by the creditor or obligee, or acts which result in a loss of such security, to which he consents. *Farmers' Bank v. Arthur*, 75 Iowa 129. This general rule, it is apparent, could not be available in the case at bar. The "additional security" which it is claimed was released by the obligee, the state, was the statutory preferential right which the state had. How could the consent of the surety be obtained to the release of this statutory right by the enactment of Chapter 189? No one had the power to act in behalf of the obligee, the state, except the legislative department, by the enactment of Chapter 189, which operated to "release" the preferential right existing under the former statute. Must the legislature have obtained the consent of the sureties to enact this statute, in order to have avoided the release of the sureties by the enactment thereof? Who would have secured such consent from the surety? To whom could they have given it, and who would have had authority to bind the state by the acceptance of such consent?

It is obvious that the rule of discharge of a surety by the release of "additional security" held by the obligee without

consent of the surety is not available to the appellants in this case.

The personal sureties, as appellants, have cited us to no authority upon the precise question presented at this point, but we think that, upon principle, the enactment of the statute repealing the preferential right which had been created by prior statute did not operate to release the sureties on the bond in question. We so hold.

This appeal is presented upon a consolidation of cases in which a large number of questions are involved, and all questions not passed upon in this opinion are expressly reserved for determination by separate opinions.

On the questions herein discussed, the decree of the trial court is, in all respects, affirmed. Motions to dismiss submitted with the case are overruled.—*Affirmed.*

All the justices concur, except DE GRAFF, J., not participating.