F. H. KENT, Appellant, v. E. C. BAILEY et al., Appellees.

SUBROGATION: Discharge of Obligations—Essential and Non-essential Elements. One may be entitled to the benefits of subrogation even though he did not advance his money (a) under any *compulsion*, or (b) in order *to protect some interest* of his own, or (c) with entire *freedom from negligence*. The important considerations are that the money be advanced under an agreement, express or implied, that the payer shall have the same rights as possessed by the holder of the discharged obligation, and that no intervening paramount equities have attached.

PRINCIPLE APPLIED: Reaves obtained a judgment against Bailey. A few days later, Bailey purchased a lot and gave the grantor a *purchase-money* first mortgage thereon. This mortgage fell due. Bailey, through his agent, sought a new loan with which to pay said mortgage. The agent explained the exact conditions to Kent and asked Kent to make the new loan, and in good faith promised him a *first* mortgage as security. Kent relied on this and advanced the money. Neither Kent nor the agent had any knowledge of the Reaves judgment, though, of course, a search of the records would have revealed it. The agent had even been informed, and honestly believed, that there were no liens on the property except the original mortgage. The money advanced by Kent was placed in a bank, and the mortgagee was told to go and get his money, which he did, and thereafter fully discharged the mortgage of record. Bailey then gave Kent a mortgage as agreed. Kent, the agent, and the bank officials all supposed that Kent's mortgage would be the first lien on the property. The value of the lot was much less than the Reaves judgment. After the deal was all closed; Kent discovered the Reaves judgment.

*Held*, Kent was entitled to be subrogated to all the rights of the first mortgagee, even though Kent did not advance the money under any *compulsion* to do so, did not advance it in order *to protect any interest* of his own, and even though, in so advancing, he was guilty, in some measure, of negligence in not discovering the Reaves judgment.

MORTGAGES: Lien and Priority—Purchase-Money Mortgage—Antedating Judgment. Principle recognized that a purchase-money mortgage is prior in right to an antedating judgment.

PRINCIPLE APPLIED: See No. 1.

EQUITY:    Jurisdiction, Etc.—Grounds—Mistake—Inexcusable Neg-
lect.    Principle recognized that equity will not grant relief
from a mistake due to inexcusable neglect, but principle also
recognized that the court will be slow to deny relief when the
mistake flows from a negligent act which injures no one but
the one guilty thereof, and when no intervening equities have
attached.

PRINCIPLE APPLIED:    See No. 1.

SUBROGATION:    Negligence—Mortgagee's Failure to Examine Rec-
ords—Excusable Negligence.   A mortgagee is not guilty of neg-
ligence *per se* by relying solely on the assurance of a mortgagor
that no prior liens exist on the property.

PRINCIPLE APPLIED:    See No. 1.

PRINCIPAL AND AGENT:    The Relation—Creation and Existence
—Implied Agency.   Principle recognized that an agent to pro-
cure a loan may, in the performance of one act, be impliedly
the agent of the borrower, and, in the performance of another
act, be impliedly the agent of the loaner.

*Appeal from Madison District Court.*—J. H. APPLEGATE,
Judge.

SATURDAY, OCTOBER 27, 1917.

THE petition alleged that, about October 11, 1913,
Theodore Hartwell sold and conveyed to E. C. Bailey Lot 8
in Block 16 in Pitzer and Knight's Addition to Winterset
for $300, said Bailey and wife executing, as part consider-
ation, two notes of $100 each, one payable October 5, 1914,
and the other a year later; that, about the time the first
note became due, Bailey employed Roy to procure an ex-
tension of time or a new loan to take up the said notes; that
Roy advised plaintiff of the situation, and that $250 would
be required to take up the mortgage and pay the taxes, and
proposed that, if plaintiff would loan that amount, Bail-
ey would execute a first mortgage on said lot as security
for the payment thereof which should be a first lien thereon;
that plaintiff, relying on the representations of Roy, gave
him his check for $250 to be surrendered to Bailey or to

whom he might direct, upon the execution of the note of $250, secured by the first mortgage on said lot; that Roy, in pursuance of plaintiff's instructions, had Hartwell leave his notes and mortgage at the Winterset Savings Bank; that Bailey executed the note and mortgage to plaintiff, as proposed, and deposited the same at said bank; that Roy, "being informed and believing there to have been no other. liens or incumbrances on said lot," through mistake and error, directed the Winterset Savings Bank to pay Hartwell the amount due on his notes and mortgage, which the bank did in the sum of $212.50, and filed a release of said mortgage for record, "believing that the mortgage executed to plaintiff was the first lien on the property," and thereupon said bank delivered to plaintiff the said note and mortgage of Bailey; that, about October 1, 1913, Reaves & Co. recovered a judgment against Bailey for the sum of $600 in the district court of Madison County, on an indebtedness in no way connected with said lot or the purchase thereof or the removal of any liens thereon; that plaintiff was without actual notice of said judgment; that Roy disobeyed the instructions of plaintiff in permitting the mortgage to Hartwell to be surrendered without ascertaining that plaintiff's mortgage was a first lien of record; that the money so furnished was used to take up Hartwell's mortgage, and plaintiff is entitled to be subrogated to the rights of Hartwell under his mortgage; that the lot was at no time worth to exceed $450; and plaintiff prayed that he be subrogated to the rights of Hartwell, and that his mortgage be established as a lien on the premises as of date October 15, 1913, to the amount of $212.50, with interest paramount to the lien of Reaves & Co. A demurrer to the petition on the ground that plaintiff was not entitled to the relief demanded was sustained. From this ruling, plaintiff appeals.—*Reversed.*

*W. S. Cooper*, for appellant.

*J. P. Steele*, for appellees.

LADD, J.— Hartwell sold the lot to

**1. SUBROGATION:**
**discharge of**
**obligations:**
**essential and**
**non-essential**
**elements.**

Bailey on October 11, 1913, for $300. To secure two deferred payments of $100 each, Bailey executed a mortgage on the lot. Upon the maturity of the first payment, Bailey employed Roy to obtain a new loan out of which to take up Hartwell's mortgage and pay the taxes. Thereupon, Roy negotiated with plaintiff, disclosing to him the facts as stated, and proposing that, if he would make the loan, he should be secured by a first mortgage and lien on the lot, and, relying thereon, plaintiff deposited his check for $250 with Roy, and Bailey executed a note and mortgage to plaintiff as proposed, and left it with said bank. Thereupon, Roy directed the bank to pay Hartwell from plaintiff's check, which it did, and Hartwell released his mortgage. Roy, in so directing the bank, was informed and believed that the property was then clear, with the exception of said mortgage, and that plaintiff's mortgage would become a first lien thereon; but on October 1, 1913, Reaves & Co. had obtained in the district court of Madison County a judgment against Bailey for the sum of $600, exceeding the value of the property by $150. The plaintiff sought to be subrogated to the rights of Hartwell, and prayed that his mortgage be declared a first lien to the extent of $212.50, the amount paid Hartwell to satisfy his mortgage. The court, in sustaining the demurrer to the petition, held that plaintiff was not entitled to such relief.

**2. MORTGAGES:**
**lien and prior-**
**ity: purchase-**
**money mort-**
**gage: ante-**
**dating judg-**
**ment.**

Though the judgment antedated the first mortgage, the latter was executed as a part of the purchase price, and therefore its lien was prior to that of the judgment. *Kaiser v. Lembeck*, 55 Iowa 244; *Laidley*

*v. Aikin,* 80 Iowa 112, 114. Priority to this judgment is what plaintiff seeks in order to avoid loss, as the value of the property does not exceed the amount of the judgment.

"Subrogation is the substitution of one person in place of another, whether as a creditor or as the possessor of any other rightful claim, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim and its rights, remedies or securities." *Jackson Co. v. Boylston Mut. Ins. Co.,* 139 Mass. 508 (52. Am. R. 728). See *Heuser v. Sharman,* 89 Iowa 355.

It has been styled a legal fiction whereby an obligation which has been discharged by a third person is treated as still subsisting for his benefit, so that, by means thereof, one creditor is substituted to the rights, remedies and securities of another. *Aetna Life Ins. Co. v. Middleport,* 124 U. S. 534. The law recognizes two kinds of subrogation, legal and conventional. By the former is meant the right of substitution which springs as a matter of course from the mere fact of the payment of a debt, without an agreement so to do between the parties. Conventional subrogation arises by virtue of an agreement, express or implied, that a third person, or one having no previous interest in the matter involved, shall, upon discharging an obligation or paying a debt, be substituted in the place of the creditor in respect to such rights, remedies or securities as he may have against the debtor. See *Wilkins v. Gibson,* 113 Ga. 31 (84 Am. St. 204) ; *Home Savings Bank v. Bierstadt,* 168. Ill. 618 (61 Am. St. 146).

The books agree that subrogation is not founded on contract or privity or strict suretyship, but is born of equity, and results from the natural justice of placing the burden where it ought to rest. The remedy depends upon the principles of justice, equity and benevolence to be applied to the facts of the particular case. It is of equitable origin, adopted to compel the ultimate discharge of a debt

or obligation by him who in good conscience ought to pay it. These principles will be found well stated in the text books on the subject, and repeated in the almost innumerable decisions. See valuable note to *American Bonding Co. v. National Mech. Bank,* 97 Md. 598 (99 Am. St. 466), in which the cases are collected. The authorities are also agreed that the doctrine, since first recognized, has been steadily expanding, and growing in importance and extent in its application to various subjects and classes of persons. *Home Sav. Bank v. Bierstadt,* supra; *Heuser v. Sharman,* supra. The remedy is to be administered according to the established rules of equity jurisprudence. *Sheppard v. Messenger,* 107 Iowa 717; *Seieroe v. Homan,* 50 Neb. 601 (70 N. W. 244) ; *Blodgett v. Hitt,* 29 Wis. 169, 183.

Reverting to the case at bar, it is to be said that the ruling of the trial court finds support in the earlier decisions and text books. Thus, in Sheldon on Subrogation, Sec. 3, it is said:

"There will be no subrogation unless the payment was made either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability. The demand of a creditor which is paid with the money of a third person, without any agreement that the security shall be assigned or kept on foot for the benefit of such third person, is absolutely extinguished; but the doctrine of subrogation will be applied to reimburse one who has been compelled to pay the debt of a third person in order to protect his own rights or to save his own property."

The citations in the note in the margin sustain this view. But the more recent decisions have adopted a more liberal view, and, in harmony with business experience, have, in the interest of justice, decreed subrogation in many cases where the courts had previously denied it.

Here the plaintiff was in no sense a volunteer, for no

one can be such who discharges a debt at the instance and request of the debtor. Roy represented Bailey, the debtor, as his agent, and the check for the amount loaned was handed to him as such upon Bailey's application through him for the loan, and on the express understanding that the mortgage of Bailey securing payment thereof should be a first lien. The situation was such as to preclude the possibility of inferring that payment was voluntary. And we are of opinion that the agreement that the mortgage to plaintiff should be a first lien was tantamount to an undertaking that whatever necessary to accomplish this would be done, even though this might require the taking of an assignment of the existing mortgage. In *Gore v. Brian,* (N. J.) 35 Atl. 897, one McCann owned four lots, on two of which there was a mortgage, one for $2,500 to Schangle, and the other a mortgage of a like amount to Buckman. McCann conveyed the four lots to Steward, who took title at the request of Caminade in order to dispose of them for him. The latter had $1,100 belonging to his mother-in-law, Mrs. Gore, to loan on first mortgage security, and instead of doing so, he took Steward's mortgage for $1,100 on the four lots, subject to the two mortgages mentioned, and thereafter, Steward conveyed the four lots to Caminade. The latter then applied to the agent of Mrs. Brian for a loan of $5,000 on the lots, but later proposed that mortgages of $625 be placed on each of the eight parcels into which the four lots had been subdivided. This was done, under the understanding that these mortgages should be first liens. The eight mortgages were executed, and out of the proceeds derived from Mrs. Brian, the two mortgages of $2,500 each were paid and canceled of record. Subsequently, upon a search of the record, the $1,100 mortgage was discovered, and in suit to foreclose the same by Mrs. Gore, Mrs. Brian, by way of the cross-bill, prayed for subrogation to security afforded by the two $2,500 mort-

gages canceled, and that her mortgages be established to that extent as prior and superior to Mrs. Gore's mortgage. After referring to some authorities, the court, in awarding relief, said:

"The doctrine of these cases is that the mere payment of a debt by one not bound to see that it is paid, or by one who is not affected in his property rights by its nonpayment, will not entitle the payer to subrogation; nor will an understanding existing in the mind of the payer that he will be entitled to subrogation so entitle him, unless this mental condition is produced by some conventional arrangement between the payer and either the creditor or debtor that this will be the consequence of the payment. If, therefore, Mrs. Brian had advanced this money to pay off the two $2,500 mortgages, with no express or implied agreement with Caminade concerning the security for her loan, she would stand in the attitude of a stranger or volunteer, with no right to be substituted in the place of the first two mortgagees. But she did not occupy this position. On the contrary, instead of being a volunteer in the transaction, she was requested by Caminade, both directly and through her agent, to advance the money to pay off the first mortgages. More than this, it was proved beyond doubt that it was understood clearly, between Caminade on the one hand and Turford and Mrs. Brian on the other hand, that the new mortgages should take the place of the old mortgages in respect to priority of lien upon the mortgaged premises. I cannot conceive a clearer case for conventional subrogation, unless Mrs. Brian has lost the advantage of her agreement by such neglect, in permitting the cancellation of the old and in receiving the new mortgage, as shuts her off from any equitable relief against the intervening $1,100 mortgage."

In *Home Sav. Bank v. Bierstadt*, supra, a like situation was presented and a like conclusion was reached, the

court, speaking through Phillips, J., saying:

"It is the agreement that the security shall be kept alive for the benefit of the person making the payment which gives the right of subrogation, because it takes away the character of a mere volunteer. Here the agreement between the debtor and the appellee, who advanced the money, was to the effect that appellee was to advance sufficient money to discharge the seven Goudy deeds of trust, and should receive from the debtor, by way of security for the money so advanced, a first mortgage upon the seven lots. In equity, that was an agreement that the Goudy deeds of trust should become security for her loan. That was the substance of the transaction, and equity will effectuate the real intention of the parties, where no injury is done to an innocent party, by applying the principle of conventional subrogation. *Draper v. Ashley,* 104 Mich. 527 (62 N. W. 707) ; *Tyrrell v. Ward,* supra; *Union Mortgage Co. v. Peters,* 72 Miss. 1058 (18 So. 497) ; *Levy v. Martin,* 48 Wis. 198 (4 N. W. 35) ; *Wilton v. Mayberry,* 75 Wis. 191 (43 N. W. 901) ; *Dillon v. Kauffman,* 58 Tex. 696. This principle will be applied even where the record shows a release of the satisfied incumbrance, as the lien so satisfied will be removed for the benefit of the party satisfying the same, where there has not been gross negligence, and where justice requires it should be done; and this will be done as against a subsequent incumbrancer whose incumbrance has not been taken or his position changed because of the record showing the discharge of the senior incumbrance."

In *Emmert v. Thompson,* 49 Minn. 386 (32 Am. St. 566), one Marr owned 240 acres of land, on 160 acres of which was a mortgage to Ormsby, and on the 80 acres, a mortgage to Hayes. He obtained a loan from Cornwell, out of which the above mortgages were satisfied, and executed a mortgage on the premises to secure the payment of Cornwell, which Cornwell believed, and Marr impliedly repre-

sented, would be the first lien on the land. A large amount of taxes were also paid out of this loan, and both the mortgages and taxes so paid were satisfied of record. Subsequently, it was ascertained that Marr had executed a mortgage to Emmert to secure the payment of $1,800, and that this mortgage was dated and recorded after the Ormsby and Hayes mortgages had become liens on the land, and prior to the execution of the mortgage to Cornwell. In an action by Emmert, praying that his mortgage be foreclosed, Cornwell intervened, and prayed that he be subrogated to the securities which had been discharged out of the proceeds of the loan made by him. The court, in holding that he was entitled to the relief prayed, remarked that:

"There are a very respectable number of cases, several having been cited, in which relief has been refused under circumstances precisely like those now before us, where one who has loaned and used his money in good faith, and for the express purpose of relieving a debtor from a pressing obligation, and his real property from a specific lien for the amount of the same, under a genuine but excusable misapprehension as to the rank and position of security taken by him on the same property, has been treated and characterized as a volunteer, a stranger, and an officious intermeddler, and denied the rights of an equitable assignee. But of late years, with the development of the principles on which the doctrine is founded, the courts have been taking a broader and more commendable view of the situation of such a party, and at this time, very little is left of the views expressed in the earlier cases. The better opinion now is that one who loans his money upon real estate security for the express purpose of taking up and discharging liens or incumbrances on the same property, has thus paid the debt at the instance, request and solicitation of the debtor, expecting and believing in good

faith that his security will of record be substituted in fact in place of that which he discharges, is neither a volunteer, stranger nor intermeddler, nor is the debt, lien or incumbrance regarded as extinguished if justice requires that it should be kept alive for the benefit of the person advancing the money, who thereby becomes the creditor.  Of the many authorities on this, we cite *Tradesmen's Building and Loan Assn. v. Thompson*, 32 N. J. Eq. 133; *Gans v. Thieme*, 93 N. Y. 225; *Sidener v. Pavey*, 77 Ind. 241; *McKenzie v. McKenzie*, 52 Vt. 271; *Cobb v. Dyer*, 69 Me. 494; *Levy v. Martin*, 48 Wis. 198; *Detroit, etc., Ins. Co. v. Aspinall*, 48 Mich. 238; *Crippen v. Chappel*, 35 Kans. 495 (57 Am. Rep. 187) ; 3 Pomeroy's Eq. Jur., Sec. 1212; Harris on Subrogation, Secs. 811, 816; Dixon on Subrogation, 165."

We are in full accord with the rule laid down by these decisions, and, as there is nothing to be found in prior decisions of this court, neither their review nor the citation of other cases seems necessary.  There are no intervening equities, the result being merely to establish a lien prior to defendant's judgment in the precise amount of Hartwell's mortgage, and at the same time accord plaintiff's mortgage the position agreed upon, in so far as possible, in restoring the *status quo*.  But it may be argued that plaintiff was negligent in not searching the record, inasmuch as such search would have disclosed the prior rendition of the judgment.  That a court will reinstate a mortgage canceled through mistake of facts is well settled.  Had the mortgage to Hartwell been satisfied with full knowledge of the facts, plaintiff would have been without standing to ask for its reinstatement as a lien.  Inasmuch as this happened through misunderstanding, was the mistake such as should be rectified by a court of equity?  That the satisfaction of that mortgage was induced by the supposition that no subsequent incumbrance existed was alleged, and, on demurrer, must be taken as true.

But equity will not rectify a mistake'

**3. EQUITY: jurisdiction, etc.: grounds: mistake: inexcusable neglect.** due to inexcusable negligence. *Fort Dodge B. & L. Assn. v. Scott,* 86 Iowa 431. There, reliance on an abstract not brought up to date was adjudged negligence. The degree of diligence exacted necessarily depends upon the facts of each case. Where the act done by mistake is one calculated to induce others to pursue a line of conduct which will put them to loss if the mistake be corrected, it should be clear that the party asking for relief has been led into the mistake in spite of the exercise of that high degree of care exacted under such circumstances. But where no

**4. SUBROGATION: negligence: mortgagee's failure to examine records: excusable negligence.** one is injured by the mistake other than the party himself, and no one has changed his position, in consequence of what has been done and of the mistake, no tenable reason appears for denying a correction of such mistake, even though a high degree of care has not been exercised. It is alleged that Roy was informed and believed that the premises were clear of incumbrance save Hartwell's mortgage, and he so assured the bank and directed payment in reliance thereon, and, though he may have received

**5. PRINCIPAL AND AGENT: the relation: creation and existence: implied agency.** the check from plaintiff as his agent, he ceased to be such after leaving the proceeds thereof in the bank, and his direction to the bank to satisfy the mortgage was an assurance that the property was otherwise clear. Therein he represented the mortgagor, and we are of opinion that neither the bank nor plaintiff, acting through it, should be denounced as negligent in relying on such assurance of the debtor. Possibly cases may be found to the contrary, but, in the absence of the appearance of something else, we are not inclined to denounce a mortgagee as negligent as a matter of law, on the sole ground that, instead of searching the records, he relied

on the solemn assurance of his mortgagor's agent, though the mortgagor himself must have known otherwise. Such was the holding in *McKenzie v. McKenzie*, 52 Vt. 271, and *Seeley v. Bacon*, (N. J.) 34 Atl. 139. See *Emmert v. Thompson*, supra; *Gore v. Brian*, supra; and *Bruse v. Nelson*, 35 Iowa 157.

The court erred in sustaining the demurrer, and its order so doing is — *Reversed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.