FRANK G. RANDELL et al., Administrators, Appellants, v.
CHARLES W. FELLERS, Appellee.

No. 42108.

FEBRUARY 7, 1934.

REHEARING DENIED NOVEMBER 22, 1934.

McCoy & McCoy, and Wagner, Hamilton & Updegraff, for appellants.

Heninger & Heninger and F. M. Beatty, for appellee.

ALBERT, J.—The right of appellants, as administrators, whose decedent was not a party to or the owner or holder of the mortgage involved, to prosecute this action to foreclose the same is predicated upon the equitable doctrine of subrogation. The essential facts are in no sense complicated and may be briefly stated.

On or about September 3, 1919, Arda Brubaker McNulty, guardian of her minor son Burl Brubaker, was, upon proper application and showing to the court, authorized to make sale of the southwest quarter of the northeast quarter of section 22, township 74, range 15, Mahaska county, the property of her ward. The land was sold, full report of sale made to, and approved by, the court. Before consummating said sale, the guardian executed a bond in the penal sum of $20,000 conditioned as by law required with C. W. Randell, appellant's decedent and another as sureties thereon. The order approving the sale of the aforesaid real property authorized the guardian " * * * to loan any balance of the ward's money in. her hands at the rate of six per cent interest per annum and only upon first mortgages upon Iowa farm land, the land securing same to be worth at least twice the amount of the loan. * * * "

On or about March 2, 1920, the guardian loaned to her brother Eugene McEwen $5,000 of the money of her ward for a term of five years, receiving as security for the payment thereof a first mortgage upon an eighty-acre tract of land located in Keokuk county, Iowa. The mortgage was duly recorded in the office of the county recorder of that county.

On January 23, 1922, a purported release bearing date December 23, 1921, of said mortgage reciting that " * * * it is redeemed, paid off, satisfied and discharged in full, * * * " was filed in the office of the county recorder of Keokuk county. No part of the loan was paid by the mortgagor at the time such purported release was executed and filed. The only payments at any time made by him thereon were of interest, the last of which was made five years after the date of the purported release and one payment of $500 on principal on August 29, 1927.

Burl Brubaker, the ward, attained his majority on November 22, 1929. The final report of the guardian showed that she was in default in the sum of $5,797.50, the balance due on the aforesaid loan to her brother Eugene McEwen. Thereupon, Burl Brubaker filed a claim for the amount due him with the administrators of the estate of C. W. Randell, deceased, surety on the bond of his guardian. The claim thus filed was allowed by the court and paid in full by appellants. Thereupon, and shortly thereafter, this action against C. W. Fellers, the present owner of the eighty-acre tract covered by the McEwen mortgage, was commenced. Although other issues were joined in the court below, the relief sought in this court is the establishment of the said mortgage lien upon the real estate

described therein as of the date of its execution; the right of appellants to be subrogated to all the rights and remedies of Burl Brubaker, the ward for whose benefit the loan was made, and his guardian, and for the foreclosure of the said mortgage. Appellee acquired title through several mesne conveyances from the mortgagor.

The foregoing statement of the facts at once suggests the probable defenses urged to appellants' cause of action. Paramount above all others is the contention that appellee is an innocent purchaser of the land in controversy for value without notice or knowledge, actual or constructive, of any defect in the purported release executed and caused to be placed of record by the guardian. The release was executed without application to, or prior authorization of, the court. The mortgage named Arda Brubaker McNulty, guardian of Burl Brubaker, a minor, of the county of Mahaska and state of Iowa, as mortgagee. The release was executed by her in her name as guardian.

 It is obvious that the payment by the debtor of the indebtedness secured by a mortgage upon real estate operates immediately to discharge the lien. It is equally true that an unauthorized release without payment by a guardian would, as between the immediate parties, including the ward and the sureties on the guardian's bond, have no such effect. It, therefore, does not require argument to demonstrate that the lien of the mortgage here involved continued to exist in spite of the purported release thereof by the guardian. It is provided by section 12581 of the Code of 1931 that:

"Guardians of the property of minors must prosecute and defend for their wards, may employ counsel therefor, lease lands, loan money, and in all other respects manage their affairs, under proper orders of the court or a judge thereof."

Loaning of the money of the ward by the guardian and the release of a mortgage given to secure the payment of such loan under the language of the foregoing statute certainly constitutes management of the affairs of the ward. Andrew v. Sac County State Bank, 205 Iowa 1248, 218 N. W. 24; Andrew v. Farmers Sav. Bank, 207 Iowa 394, 223 N. W. 249; Slusher v. Hammond, 94 Iowa 512, 63 N. W. 185; Bates, Guardian v. Dunham, 58 Iowa 308, 12 N. W. 309.

It is provided by section 12772 of the Code of 1931 as follows:

"All proposed investments of trust funds by fiduciaries shall first be reported to the court or a judge for approval and be ap-

proved and unless otherwise authorized or directed by the court under authority of which he or it acts, or by the will, trust agreement or other document which is the source of authority, a trustee, executor, administrator or guardian shall invest all moneys received by such fiduciary, to be by him or it invested, in securities which at the time of the purchase thereof are included in one or more of the following classes: \* \* \* "

At the time the loan in question was made, section 364 of the 1913 Supplement to the Code and section 365 of the Code of 1897 were in force. These sections are as follows:

"Sec. 364. Where investments of funds are to be made, including those to be made by executors, administrators, trustees and guardians, and no mode of investment is pointed out by statute, they may be made in the stocks or bonds of this state, or of those of the United States, or in bond or mortgage upon real property of the clear, unincumbered value of twice the investment *or under order of court in bonds issued by or under the direction of cities, towns, counties, school or drainage districts of this state.*

"Sec. 365. When such investment is made by order of any court, the security taken shall in no case be discharged, impaired or transferred without an order of the court to that effect, entered on the minutes thereof."

The court is divided in opinion as to the correct interpretation of the foregoing statutes. A minority of the court are of the opinion that section 365 of the Code of 1897 must be limited in its application to the italicized portion of section 364. The italicized portion of section 364 first appeared in the section upon the enactment of chapter 38, Laws of the Thirty-fifth General Assembly. The legislative history of section 365 begins with the Code of 1851, appearing therein as section 2508. It has continued through the several revisions of our statutes to the present without change. It would seem from this legislative history that the legislature, by the enactment of chapter 38, Laws of the Thirty-fifth General Assembly, expressed no intention to limit the terms or scope of section 364. The loan by the guardian to McEwen was not reported to, or specifically authorized by the court, but that it was made in pursuance of the general order and authorization previously entered must be conclusively assumed. The loan was, therefore, made under au-

thority and order of the court and could be legally released only upon compliance with section 365 of the Code of 1897. To hold otherwise would be, in effect, a denial by the court of the protection vouchsafed to wards by solemn legislative enactments. These statutes were not enacted for the benefit of guardians or third parties, but solely for the benefit and protection of the property of the wards of the court.

The precise question now before us does not appear to have been previously passed upon by this court. The case nearest in point is Citizens State Bank v. Victoria Sanitorium, 179 Iowa 671, 161 N. W. 664. The action there involved was in equity to foreclose a mortgage upon real estate. Acting under the authority of the court, the administrator who appeared with others as an intervener in the case had released a prior mortgage of record. The contention of interveners was that the order of the court, for reasons stated, was illegal and void. Interveners asked that it be canceled. set aside, and held for naught. The court, under the facts of that case, sustained the order, but, in the course of the discussion, this court gave serious consideration to the necessity for such order and authority. Manifestly, the attempted release by the guardian of the mortgage in question without payment was constructively fraudulent as against the ward and the sureties upon the guardian's bond. The release was illegal and wholly ineffective as between the parties, the ward, and the sureties on the guardian's bond for at least two reasons, namely, the debts secured thereby were not paid and it was not preceded by a proper order of court. Of course, if the execution of the release had been preceded or accompanied by payment of the mortgage indebtedness and the guardian had made proper accounting thereof in the ward's estate, the lien would, of necessity, have ceased to exist.

The question to be answered at this point presents much greater difficulty and possible uncertainty. It is not uncommon for an issue as to the actual or apparent authority of a mortgagee to release a mortgage to arise. It is clear that the release in question was executed without authority. Whether an issue of apparent authority is, under the facts of this case at this time involved, we deem it unnecessary to consider. It is conceded that appellee and each of his predecessors in title through McEwen, the mortgagor, had actual notice of the mortgage and of the purported release. They were shown upon abstracts of title exhibited to each grantee prior to the

consummation of the purchase. No element of actual fraud is involved under the issues. Were the respective purchasers of real property, including appellee, charged with notice of the defect in the authority of the guardian to release the mortgage?

It is the law long settled in this state that actual notice exists where the facts and circumstances were such as to lead a reasonably prudent person to make inquiry which, if made, would have resulted in ascertaining the truth. This is sufficient to constitute actual notice. Mill Owners Mut. Life Ins. Co. v. Goff, 210 Iowa 1188, 232 N. W. 504; Johnson v. Chicago, B. & Q. R. Co., 202 Iowa 1282, 211 N. W. 842; Aultman & Taylor Machinery Co. v. Kennedy, 114 Iowa 444, 87 N. W. 435, 89 Am. St. Rep. 373; Weare & Allison v. Williams, 85 Iowa 253, 52 N. W. 328; Traer v. State Board of Medical Examiners, 106 Iowa 559, 76 N. W. 833; Benton County Savings Bank v. Boddicker, 105 Iowa 548, 75 N. W. 632, 45 L. R. A. 321, 67 Am. St. Rep. 310; Allen v. McCalla, 25 Iowa 464, 96 Am. Dec 56; Wilson v. Miller & Beeson, 16 Iowa 111.

Appellee and his predecessors in title were bound to know and to take cognizance of statutes defining and limiting the authority of guardians and other similar trustees. Such officers are a part of and act under the authority and direction of the court. Both the language of the mortgage and of the release gave notice that the mortgagee was the guardian of her minor son and acted solely in her capacity as such. The statute in specific terms forbade her to discharge or impair the security she held for the protection of her ward's estate without previous authority of the court entered on the minutes thereof. The purported release contained no recital that it was executed in pursuance to and observance of an order of court. Actual knowledge of the statutory requirements and the limited authority of the guardian were not essential to impart legal notice and knowledge to appellee. Manifestly, if the statutes imposing limited authority upon the guardian had been actually familiar to appellee, he would have at once demanded a showing upon the abstract of full and complete compliance therewith. He was bound by the law and must be held to have had notice and knowledge thereof. The slightest inquiry upon his part would have resulted in full knowledge of all the essential facts including the all important fact that the indebtedness secured by the mortgage was not paid. This precise question was before the Court of Civil Appeals

of Texas in Freiberg v. De Lamar, 7 Tex. Civ. App. 263, 27 S. W. 151. The court said:

"The guardian, Mrs. De Lamar, had no power without authority from the probate court to discharge Merritt from his liability for the debt, and release the lien by which it was secured; and, notwithstanding her act in receipting the note and executing the instrument to Freiberg, the debt was not discharged, and the lien to secure it continued in full vigor. Freiberg knew of the existence of the charge against the property in favor of the minor, was charged by law with notice of the guardian's want of power to release it, and must abide the legitimate consequences of the failure to pay the debt."

See, also, International Trust Co. v. Preston, 24 Wyo. 163, 156 P. 1128.

Some reference is made by counsel to section 11826 of the Code of 1931 which requires certified copies of orders or judgments affecting real estate in any county other than that in which administration or guardianship is originally granted to be forwarded to the clerk of the county in which the real estate is situated. The guardianship in this case was in Mahaska and the mortgaged premises in Keokuk county. No record or order approving or authorizing the guardian to release the mortgage here involved was ever made in Mahaska county. There was, therefore, nothing, even if required in cases of this character, to be certified by the clerk of the district court of Mahaska county to the proper officer in Keokuk county. It is not easy to perceive just how appellee would claim advantage under this statute. Both the guardian and the mortgagor knew that the purported release was fraudulent as against all interested parties. This is true whether they, in fact, intended to perpetrate a fraud upon innocent parties or not.

Another circumstance to be considered is that the note secured by the mortgage did not mature until 1925. Perhaps little weight should be attached to this fact. This court, however, in Day v. Brenton, 102 Iowa 482, 71 N. W. 538, 63 Am. St. Rep. 460, in which a release by a trustee without payment and after the note secured thereby had been transferred was involved gave great emphasis in argument to the fact that the note was past due when the release was executed. Some reliance is placed by appellee upon the holding of the court in the above case sustaining the release. We find nothing in the language of the court in any sense in conflict with

the conclusion reached herein. The cases are distinguishable upon the facts.

It is the conclusion of the court that appellee must be held to have purchased the mortgaged premises with notice or knowledge of the invalidity and ineffectiveness of the purported release and may not now assert, as a defense, the right of an innocent purchaser for value or defeat the claimed right of appellants to subrogation under the doctrine of equal equities. In the absence of such notice or knowledge, a contrary conclusion must necessarily have followed. We deem it unnecessary, therefore, to discuss or refer to the many authorities cited and relied upon at this point by appellee.

■■■ The doctrine of subrogation is of equitable origin, but is supplemented to some extent in this state by statute. Section 11667, Code 1931. It has been too often defined and the principle stated to require elaborate discussion at this time. The court, quoting in part from Jackson Co. v. Boylston Mut. Ins. Co., 139 Mass. 508, 2 N. E. 103, 52 Am. Rep. 728. in Kent v. Bailey, 181 Iowa 489, 164 N. W. 852, said:

"'Subrogation is the substitution of one person in place of another, whether as a creditor or as the possessor of any other rightful claim, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its right, remedies, or securities.' * * * See Heuser v. Sharman, 89 Iowa 355, 56 N. W. 525, 48 Am. St. Rep. 390.

"It has been styled a legal fiction whereby an obligation which has been discharged by a third person is treated as still subsisting for his benefit, so that by means thereof one creditor is substituted to the rights, remedies, and securities of another."

See further Mill Owners Mut. Life Ins. Co. v. Goff, supra, Heuser v. Sharman, 89 Iowa 355, 56 N. W. 525, 48 Am. St. Rep. 390, and Leach v. Commercial Sav. Bank, 205 Iowa 1154, 213 N. W. 517.

The doctrine is universally applied in behalf of a surety who has been compelled to pay the debt of his principal. Having held that appellee does not stand in the position of an innocent purchaser for value without notice of the mortgage in controversy and of the invalidity of the purported release, the right of appellants as the legal representatives of their decedent whose estate has been compelled to make good the defalcation on the guardian's bond, to be

subrogated to all the rights and remedies of the guardian and Burl Brubaker follows as a matter of course. As a part of the order of the probate court establishing the claim of Burl Brubaker against the estate of C. W. Randell, the court said:

"It is further ordered and adjudged by the court that upon the payment of the claim herein allowed by the estate of C. W. Randell, deceased, the said estate and Frank G. Randell and Charles A. Randell, as administrators thereof, shall be and they are hereby subrogated to any rights that Arda Brubaker McNulty, as guardian of Burl Brubaker, and Burl Brubaker, claimant herein, may have in and to the note and mortgage referred to in claimant's claim, to the amount of $5,797.50 and interest thereon at six per cent per annum from this date and to the judgment rendered on said note."

An appeal was taken from the order of the court allowing the claim of Burl Brubaker against the estate of C. W. Randell. The order was, however, affirmed. See In re Guardianship of Burl Brubaker, 214 Iowa 413, 239 N. W. 536. It is now urged by appellee that, because of appellants' plea in resistance to the claims of Burl Brubaker that the mortgage had been released, the judgment entered in said action has become res adjudicata and that they may not now assert any right in conflict with such judgment. The record does not disclose any adjudication of the point urged, nor do we find in the record in this case a plea of former adjudication. The point is without merit, and in no sense necessarily involved in the proceeding in probate.

There is also a plea of estoppel based in part upon the fact that the purported release was executed for the purpose of enabling the mortgagor to sell and convey the real estate free from incumbrance and, partly, upon the theory that the purchaser thereof paid value therefor without notice of the invalidity of the release. Manifestly, the plea is without equity. We have already announced the conclusion that McEwen's immediate grantee was not an innocent purchaser without notice of the prior equity now asserted by appellants.

Another plea is the statute of limitations. This plea is also without merit. The right to which appellants were subrogated was to enforce the lien of the mortgage upon the real estate described therein. The debt was not barred by the statute and necessarily the right of foreclosure was not barred.

Other issues are tendered by appellee and ably presented in argument supplemented by the citation of many authorities. But, as what we have already said necessarily disposes of .the appeal, it would not be profitable to prolong this opinion by an extended discussion of each of the many propositions urged. We deem further discussion unnecessary. The judgment and decree of the court below must be and it is in all particulars reversed, and the cause will be remanded to the district court of Keokuk county for decree in harmony with this opinion.—Reversed.

CLAUSSEN, C. J., and KINDIG, STEVENS, DONEGAN, ANDERSON, and KINTZINGER, JJ., concur.

EVANS, J. (dissenting)—I am unable to agree with the majority opinion. The action is brought against the defendant alone to reestablish a pre-existing mortgage lien on a certain forty-acre tract of land acquired by the defendant under warranty deed. A release of said mortgage by the mortgagee thereof had been delivered and recorded many years before the acquisition of the land by this defendant. The mortgagee was a guardian and took, held, and released the mortgage, as such. The mortgage was taken in March, 1920, and released in December, 1921. The release expressly asserted the fact that the mortgage had been paid in full. The mortgagor was a brother of the mortgagee-guardian. The evidence shows that the purpose of the release was to enable the mortgagor to sell the mortgaged real estate to a prospective customer, one Knaak. Upon the filing of the release, the mortgagor conveyed the property to Knaak by warranty deed and received from Knaak the full purchase price of $12,000. Some years later Knaak conveyed the property to Dewey; and Dewey thereafter to Harter; and Harter to this defendant, Fellers, in 1927. All these conveyances were by warranty deed. The validity of such release was never challenged until the bringing of this suit in 1932. The mortgaged land is situated in Keokuk county, Iowa. The guardianship proceeding was pending in the probate court of Mahaska county. The ward became of age in 1929. In a hearing upon her final report, the guardian and her bondsmen were held liable to the ward for the full amount of the mortgage loan. The plaintiffs are the administrators of the surety and they stand here in his shoes. They ask in this proceeding that they be subrogated to whatever rights were possessed by the guardian or

by the ward. As against this forty-acre tract now owned by the defendant, they aver in substance that the purported release of the mortgage by the guardian in 1921 was null and void *ab initio* for want of an order by the probate court authorizing the same. They ask to adjudicate such nullity of the instrument and to re-establish the lien of the mortgage thus released. It is the theory of the plaintiffs that this ward could have maintained an action against this defendant to re-establish his mortgage lien upon this land. To this right of the ward they ask to be subrogated.

In this first division of the dissent I wish to call attention to the rule which governs a court of equity in the application of the doctrine of subrogation. Assuming it to be true that the ward in this case could have nullified the instrument of release and could have enforced the mortgage against the defendant, it does not follow that the right of subrogation in the appellants is coincident with such right of the ward. It is not enough for the appellants to show that the rights of the ward were superior in equity to the rights of the defendant. On the contrary, it is incumbent upon them to show that as between *them and this defendant their equities are superior to those of the defendant.*

Subrogation is one of the schemes of equity, which is brought to bear upon a case where two innocent parties may become the victims of liability for the wrong done by a third party and whereby the injured party or creditor may select the defendant at his own election. The defendant so selected may discharge the liability and may thereby become entitled to ask subrogation as against the other innocent party. In such a contest between the two innocent parties, the plaintiff therein must show a superior equity over that of the other. If, as between them, the equities are equal, no relief by subrogation will be granted. This subject was quite fully discussed by this court in Baker v. American Surety Company, 181 Iowa 634, 159 N. W. 1044. In that case one Brown was the financial secretary of a certain organization known as the Local Union. Said Local Union kept its funds in a local bank. Brown was under bond. He forged various orders and checks and by means of such forgeries collected the amounts thereof out of the bank account of the Local Union. By reason of these delinquencies, his surety became liable; the bank likewise became liable for the payments made by it upon the spurious checks. The Local Union proceeded against the surety and recovered. The surety sought subrogation as against the bank.

We held that the bank had the weightier equities notwithstanding its liability. From the opinion in that case we quote:

"Subrogation is defined by Bispham as: 'The equity by which a person who is secondarily liable for a debt, and has paid the same, is put in the place of the creditor, so as to entitle him to make use of all the securities and remedies possessed by the creditor, in order to enforce the right of exoneration as against the principal debtor, or of contribution against others who are liable in the same rank with himself.' * * *

"Subrogation is said in section 1 of Sheldon on Subrogation to be: 'The creature of equity, and is so administered as to secure real and essential justice without regard to form, independently of any contractual relations between the parties to be affected by it. It is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter.' * * *

"Wherever the doctrine (of subrogation) is made use of it is always for the promotion of justice and the prevention of inequitable results. It will never be enforced, when doing so would be inequitable, or where it would work injustice to others having equal equities. Makeel v. Hotchkiss, 190 Ill. 311, 60 N. E. 524, 83 Am. St. Rep. 131; 37 Cyc. 370. It necessarily follows that the *equities of one seeking subrogation must be greater than those of him against whom subrogation is sought.* Fort Dodge B. & L. Ass'n. v. Scott, 86 Iowa 431, 53 N. W. 283.

" 'The doctrine of subrogation never interferes with equal or superior rights of others.' Vaughan v. Jeffreys, 119 N. C. 135, 26 S. E. 94.

"See Musgrave v. Dickson, 172 Pa. St. 629, 33 A. 705, 51 Am. St. Rep. 765. As remarked in Acer v. Hotchkiss, 97 N. Y. 395: 'The doctrine of subrogation is a device to promote justice. We shall never handle it unwisely if that purpose controls the effort, and the resultant equity is steadily kept in view.' * * *

"The surety company then is entitled to subrogation, if at all, to any claim the local union may have against the principal, on the bond, Brown, or against any security said union may have on his property. But it had none, and the surety company is praying for no relief as against Brown or his property. Its cross-petition is based on the *bank's liability* to said union for the amount paid out

by it on the forged checks, orders, or indorsements, and it prays therein for subrogation to the claim of the local union on the theory that the bank's liability is primary and its liability secondary thereto. Of course, the bank necessarily assumed the risk in paying others than those to whom genuine instruments were payable, and in paying to others it acted without authority, and might not charge sums so paid to the account of the local union. The Local Union could have insisted that the bank account for all moneys on deposit, including those wrongfully applied on the forged checks, orders, or indorsements, and on refusal maintain an action therefor. German Sav. Bank v. Citizens Nat. Bank, 101 Iowa 530, 70 N. W. 769, 63 Am. St. Rep. 399. But the wrongful diversion of these moneys was induced by the dishonest conduct of Brown to whom the money was paid, and were the bank held for the payment of the funds dissipated it would have a cause of action against Brown therefor. The plain difference in the situation of the two is that were recovery had by the local union against Brown, he could not recoup in an action against the bank, whereas the bank, if compelled to restore to the union the moneys paid on the forged instruments, might demand reimbursement from Brown and upon refusal recover judgment against him. The local union has elected to sue the surety on the bond of Brown rather than the bank. If the surety is adjudged liable thereon and pays the alleged loss occasioned by Brown's dishonesty, it will merely pay Brown's indebtedness and not that of another, even though the other may also be liable therefor. At the most it is a case where each of two parties may be held for the dissipation of the same moneys, the bank because of paying out without authority, and the other because of fraudulently inducing the bank so to do. In such a case both are absolutely liable and neither entitled to subrogation, for either in paying is satisfying his own indebtedness. But the bank on payment undoubtedly could recover over from the wrongdoer. Moreover, the equities of the surety upon payment would be measured by those, if any, existing in behalf of its principal, Brown, and, as between Brown and the bank, all are in favor of the bank, and under the rules stated subrogation must be denied. Otherwise the forger or his surety would be preferred to the one swindled by his forgeries."

To similar effect as the foregoing is Kent v. Bailey, 181 Iowa 489, 164 N. W. 852; Day v. Brenton, 102 Iowa 482, 71 N. W. 538, 63 Am. St. Rep. 460; Livermore v. Maxwell, 87 Iowa 705, 55 N. W.

37. Cases from other jurisdictions to the same effect are Northern Trust Co. v. Consolidated Elevator Co., 142 Minn. 132, 171 N. W. 265, 4 A. L. R. 510; Rowley v. Towsley, 53 Mich. 329, 19 N. W. 20; and American Bonding Co. v. State Savings Bank, 47 Mont. 332, 133 P. 367, 46 L. R. A. (N. S.) 557.

In the Northern Trust Company case here cited, the plaintiff seeking subrogation was a surety on a bond. The principal of the bond was a grain company, which received grain in storage, as bailee. Such bailee converted the grain and retained the proceeds. The grain thus converted was sold to a certain elevator company, which purchased and paid for the grain in good faith. The surety having paid the loss caused by the breach of the bond, sought subrogation and impleaded the defendant-elevator company as the purchaser of the grain from the surety's principal. The court held that the equities of the innocent purchaser were superior to that of a surety on the bond and denied the subrogation. To similar effect were the cited cases from Michigan and Montana. We find no conflict in the authorities on this question. Granting therefore that the ward in this case would have prevailed in enforcing his mortgage as against the defendant, it is equally true that he could have prevailed, and did prevail against the surety himself who was represented by the plaintiffs herein. If the rule of recovery in subrogation cases simply required the plaintiff to prove the liability of the defendant to the third party, then litigation on that branch of the law would naturally become a matter of manipulation and jugglery. The first to be sued of the innocent parties could satisfy the claim as against himself and could recover it back in full by the mere process of subrogation. This is why equity interposes its discretion and weighs the equities as between the two innocent parties. It thus leaves no motive to a race between the two innocent parties as to which of them shall become first entitled to demand subrogation. The defendant herein claims the status of an innocent purchaser in good faith and for value. In all the cases that have come under our consideration, the equities of a surety in his relation to his principal have always been deemed inferior to those of innocent purchasers of property for value. The liability of a surety is deemed legal rather than equitable and falls upon him strictly pursuant to his express contract.

II. The answer to the foregoing, as made in the majority opinion, is that the defendant was not a good faith purchaser with-

out notice. It is held in substance that he had sufficient notice to charge him with knowledge of all the material facts. The theory advanced at this point by the majority is that the record of the mortgage gave notice of the trusteeship of the mortgagee and that the record of the release disclosed the absence of any order of the court authorizing the release; that the purchaser had an abstract of title and that this furnished him sufficient notice to put him upon inquiry and that he was therefore charged with knowledge of all that an inquiry would have disclosed. It is further contended that the mortgage itself was one made pursuant to an order of the court; that for such reason it could not under section 12773 be released except upon order of the court. The majority opinion quotes section 12772. This section was enacted by the 43d General Assembly, chapter 259, section 1. It is more peremptory in some respects than any statute that preceded it. It was not in existence in 1920 nor 1921 when the mortgage and release under consideration here were executed. The two corresponding statutes, which were in force at the time of the execution of these instruments, were section 364 of the 1913 Supplement to the Code and section 365 of the Code of 1897. These were as follows:

"Sec. 364. Where investments of funds are to be made, including those to be made by executors, administrators, trustees and guardians, and no mode of investment is pointed out by statute, they may be made in the stocks or bonds of this state, or of those of the United States, or in bond or mortgage upon real property of the clear, unincumbered value of twice the investment *or under order of court in bonds issued by or under the direction of cities, towns, counties, school or drainage districts of this state.*" (The italics are ours.)

"Sec. 365. When such investment is made *by order of any court,* the security taken shall in no case be discharged, impaired or transferred without an order of the court to that effect, entered on the minutes thereof."

It will be noted that under section 365, an investment made by order of the court may not be discharged without an order of the court. It may be noted further that in section 364, two classes of investments are set forth and I may refer to them as classes 1 and 2. Class 1 points out certain investments, which a fiduciary may make. This includes a "mortgage upon real property of the clear

unincumbered value of twice the investment." Class 2 describes certain other investments including municipal bonds as being permissible "*under order of court*". It seems clear to me that the prohibition contained in section 365 has reference to class 2, described in section 364, and has no reference to the investments described in class 1. The statute itself, section 364, permitted a fiduciary to invest the funds of his beneficiary in first mortgages on real estate where the value of the real estate is twice the amount of the investment. The majority opinion relies upon the prohibition contained in section 365, now section 12773, as referring to investments expressly permitted by section 364. Unless therefore this prohibition shall be deemed as applying in 1921 to all investments by a fiduciary, then the guardian in this case did have power in good faith to make the investment defined in section 364; nor did the release thereof come under the prohibition of section 365. That prohibition by its very terms applied only to such investments as were required to be made "under order of court".

It should be noted here that the appellant claims, and the majority opinion holds, that this particular loan was made "under order of court". It appears from the record that in 1919, before any money had come into the hands of the guardian for investment, the court had entered upon the probate record of that case a general order substantially in the language of section 364. That order had no reference to any particular investment. The appellants rely upon that order as bringing this investment within the prohibition of section 365. The order was a mere repetition of the statute in general terms and in my judgment served no particular function; nor did it purport to put any restrictions upon the guardian other than those appearing in the statute itself. Prior to the enactment of section 12772, by the 43d General Assembly, chapter 259, section 1, there was no statute in force, which restricted the terms of section 364, as herein set forth. It was, of course, the duty of the guardian to make reports of all her doings. But the existence of that duty did not abridge the power of the guardian under then existing law to make the investment, which conformed to section 364, and to release the same upon payment thereof.

III. I proceed to the question of notice to the defendant as a purchaser. It is the express view of the majority that the defendant had notice sufficient to put him upon inquiry and thereby to charge him with notice of all the facts, which an inquiry would develop.

The evidence in this case consists almost wholly of stipulations of the parties. It was stipulated that the defendant and his predecessors had no knowledge that the mortgage was unpaid. I am not quite able to see why such a stipulation should not confine the plaintiffs to a claim of constructive notice only. What the appellants do claim is that the possession of abstract of title was sufficient to give actual notice and the majority opinion so holds. The majority opinion concedes that, if the mortgage had in fact been paid, the release would have been good. Surely that proposition ought to be deemed sound, even if it were not conceded. This release was executed in ordinary form before a notary public. It asserted in express terms that the mortgage was paid in full. Did the purchaser have a right as a reasonably prudent man to rely upon that solemn assertion? The argument of the majority is that the record of the release disclosed that it had not been presented to the court and had not been approved by the court. But it did disclose that the *mortgage had been paid*. That fact would release the mortgage regardless of any approval of the court. It is urged that because of the absence of court approval the purchaser was put upon inquiry and that an inquiry would have developed all the facts. Upon this record it is a mistake to say that the record of the release, as made in Keokuk county, affirmatively apprised the purchaser of any infirmity in the release. The claim of the appellants at this point is a negative one. It is that the record of the release in Keokuk county did not purport to show that the release had been approved by the court; and that in the absence of an affirmative showing that the release had been approved by the court, it was incumbent upon the purchaser to know the law and thereby to recognize the infirmity of the release. There is nothing out of the ordinary in the circumstance thus relied on by the majority. This release was recorded by the county recorder of Keokuk county in the real estate mortgage record. The mortgage itself was so recorded. These records are not intended, under the statute, as probate records. If the circumstance here relied on should be deemed as sufficient warning to the purchaser, it was a warning that he refer to the probate records of Keokuk county. It is the policy of our statutes to provide for a county record of all instruments, which affect titles to real estate in such county.

Sections 11826, 11949, and 12585, provide:

"11826. A certified copy of any order, judgment, or deed, affecting real estate in any county other than that in which administration or guardianship is originally granted, shall be furnished to and entered by the clerk of the district court of the county where such real estate is situated in the probate records of said court."

"11949. When the subject of the sale, conveyance, or mortgage is located in a county other than that in which administration is granted, a complete transcript of the record of all proceedings relating thereto shall be filed by the administrator in the office of the clerk of the district court in such county, and he shall cause the same to be copied at length in the probate records of such county."

"12585. If an order is made by such court affecting the title of lands lying in another county, a certified copy of such order, and of all the papers on which it is founded, shall be transmitted to the clerk of the district court in the county where such lands are situated, who shall enter the same on the proper docket, index, and make a complete record thereof, in the same manner as if the cause in which the order is made had been commenced in his court."

None of the probate proceedings in Mahaska county were made of record in Keokuk county at any time. And this is true of the blanket order of September, 1919. This is the order upon which appellants rely for bringing into operation the prohibition contained in section 12773. The argument at this point is that the purchaser was bound to know the order of September, 1919; and that therefore he was bound to know that this order brought the case within the prohibition of such latter section. This is only saying that these orders entered in the probate record in Mahaska became constructive notice to the purchasers of land in Keokuk county. I submit that the very fact that the probate records of Keokuk county disclosed no order affecting the title of land in Keokuk county was calculated to assure the purchaser that there was no such order; that he had a right to believe that the mortgage had been made by the guardian pursuant to the provisions of section 364; and that he was justified in believing in good faith the assertion of the release that the mortgage had been fully paid.

Some stress is laid by the majority upon the fact that the mortgage was not yet due. Granting that such a circumstance would carry an element of warning, the circumstance itself is reduced to a vanishing point in this case. Though the mortgage was dated

March, 1920, and drawn payable in March, 1925, it was also provided therein that it should be payable at the election of the mortgagor on any interest-paying date and that the interest should be payable semi-annually.

Furthermore, so far as the present defendant is concerned, he became a purchaser·in 1927. If therefore we may regard this circumstance as of some degree of significance as against the first purchaser, Knaak, it has none whatever against the good faith of the purchaser in 1927.

It is the general rule that in order to put a purchaser upon inquiry, it is incumbent upon his adversary to show some source of information to which the purchaser could have reasonably resorted and which would have disclosed the true facts. That rule is quite ignored herein. Let me confine the discussion for the moment to the purchaser, Knaak. He was the first purchaser. He bought and paid the purchase price in cash. He had before him the solemn assertion of the mortgagee-guardian, whose interests were adverse to the mortgagor, that the mortgage was fully paid. She executed the release in South Dakota. The release appears to have been delivered to the mortgagor, who caused the same to be recorded. What was the source of information that was fairly available to Knaak, from which he could ascertain that the mortgage was not paid? Was he required to go to South Dakota and to ask the guardian whether her assertions were true? Would he have been better entitled to rely upon her oral assertions than upon her written ones? The mortgagor caused the release to be recorded and received from the purchaser the full purchase price. Was his conduct less solemn than an oral statement would have been? The very conditions that enabled the mortgagor to obtain the purchase price of the land required a full warranty deed. There is not a line of evidence in the record, which indicates any other source from which information could have been had. These sources of information had already spoken. The probate record of Keokuk county was silent. The very silence of the record was calculated to lull the purchaser into security. Did good faith and ordinary prudence on the part of the purchaser require him to distrust or to accuse? The very fact that the purchaser was trustful and unsuspicious was an evidence of his good faith and not of bad faith. If this mortgagee and this mortgagor had verbally assured the purchaser that the mortgage was paid, and if he had relied upon such representation, could he not

thereby have assumed the status of a good faith purchaser without notice; and this even though he might not prevail over the rights of the ward?

So much for Knaak, the first purchaser. Suppose we abandon him and concede that he was nearer to the facts and in a better condition to discover the fraud than any of the subsequent purchasers. What about this defendant, Fellers? He purchased in July, 1927. So far as appears, he had no proximity to the facts pertaining to the probate case. The release had been on record for more than five years unchallenged. The mortgage was long past due. The deed record showed three conveyances of the land since the release was recorded. The recitals of the release were reassuring and unchallenged. He was assured thereby that the mortgage was paid. If that fact had been true, nothing else would have been material. No ready sources of information to him are suggested other than the later probate proceedings in Mahaska county. The question at this point is not whether the ward lost his rights in the mortgage, but whether Fellers was an innocent purchaser in good faith. He could have been such and yet have fallen short of a defense as against the ward. Right here is a crucial point in the discussion. The argument of the majority presupposes that in order to prevail against these plaintiffs it was incumbent upon the defendant to show a defense that would have prevailed against the ward; whereas the equity rule referred to in the first division hereof presupposes that both innocent parties were inferior in their equities to the rights of the ward. If it is incumbent upon the defendant to show a defense good as against the ward in order to prevail as against the plaintiffs, then the equity rule referred to serves no function whatever. The question of duty of a purchaser to inquire is akin to the question of his negligence in failing to inquire. In Kent v. Bailey, 181 Iowa 489, 164 N. W. 852, we had under consideration the question herein raised. In that case Kent had agreed to loan to Bailey a sum of money upon a first mortgage on certain lots, which already carried a mortgage. The purpose of the parties was to pay off the existing mortgage with the money to be loaned by Kent. There was in fact a judgment of record against Bailey, which fact was unknown to Kent. While in ignorance, Kent prematurely paid off the first mortgage in the expectation of receiving a substitute mortgage from Bailey. He thereupon discovered the existence of the judgment, which was equal in amount to the value of the

property. He brought an action and asked for subrogation to the lien of the first mortgage, which he had discharged. The right of subrogation was resisted by the judgment-holder and it was urged that plaintiff's predicament was the result of his own negligence. We held that Kent was guilty of a degree of negligence, but that it was not sufficient under the circumstances to defeat his right to equitable relief. We said:

"But where no one is injured by the mistake other than the party himself, and no one has changed his position, in consequence of what has been done and of the mistake, no tenable reason appears for denying a correction of such mistake, even though a high degree of care has not been exercised. * * *

"Possibly cases may be found to the contrary, but in the absence of something else appearing. we are not inclined to denounce a mortgagee as negligent as a matter of law on the sole ground that instead of searching the records he relied on the solemn assurance of his mortgagor's agent, though the mortgagor himself must have known otherwise."

Another case in which this same question was involved was Day v. Brenton, 102 Iowa 482, 71 N. W. 538, 63 Am. St. Rep. 460. In that case a trust deed was released by a purported trustee without authority to release. A certain loan was secured by the trust deed. The trustee purported to release and acknowledge receipt of payment. The notes secured by the trust deed had been transferred. An innocent purchaser of the land resisted the later foreclosure of the trust deed. It was claimed that the purchaser was negligent in failing to discover the facts. In that case we established the title in the innocent purchaser as against the true holders of the notes. A like situation was involved in Livermore v. Maxwell, 87 Iowa 705, 55 N. W. 37. In that case also a trust deed was released and payment acknowledged by one, who had no authority to do so. We held also in that case that an innocent purchaser had a right to rely upon the apparent authority and was not negligent in failing to inquire further into the integrity of the release. The discussion in all the foregoing cases runs counter to the argument of the majority, on the question of negligence or failure to pursue a sufficient inquiry.

I submit that the records of Keokuk county fully support the title of the defendant and this alone made a prima facie case of good faith on his part. There is no suggestion of bad faith in fact on the

part of the defendant, as distinguished from a breach of legal duty in failing to pursue an inquiry. His duty in that respect is to be weighed in this case not as against disabilities of the ward, but as a comparison of equities between the *plaintiffs* and himself.

I am conceding, for the purpose of the argument, that the equities in favor of this defendant are inferior to those of the ward. In such assumption, account is necessarily taken of the disability of the ward. In an action between him and any purchaser, such disability would constitute the major strength of his case. The plaintiffs cannot be subrogated to such disability; nor can the superiority of the ward's equity over the equity of the defendant operate as a cause of action for the plaintiffs. The equity of the ward was superior to that of the plaintiffs as well. In that respect they occupy no better position than the defendant. If inferiority to the equities of the ward be destructive of defendant's defense, it must be deemed equally destructive of the plaintiffs' cause of action.

This only illustrates the reason for the equity rule, which confines the contest to a comparison of equities as between the parties to the suit.

My discussion has become prolix and I shall pursue it no further. The case is unique in its facts. It has conflicting plausibilities. It has been argued very skillfully. I am persuaded that the finding of the district court should be sustained.

MITCHELL, J., joins in this dissent.